

April 3, 2024

**BY CM/ECF**

Catherine O'Hagan Wolfe
Clerk of the Court
United States Court of Appeals for the Second Circuit
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

Re: No. 19-1769, *Sullivan v. Barclays PLC*

Dear Ms. O'Hagan Wolfe,

Plaintiffs-Appellants respectfully submit *Okla. Firefighters Pension & Ret. Sys. v. Banco Santander*, 92 F.4th 450 (2d Cir. 2024), as supplemental authority.

*Santander* represents yet another case—decided long after the decision below—confirming that those responsible for the sale of price-fixed financial instruments in the United States are subject to personal jurisdiction here. *See id.* at 453; *In re Platinum & Palladium Antitrust Litig.*, 61 F.4th 242, 268-74 (2d Cir. 2023) (financial instruments priced based on London benchmark);[1] *Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp.*, 22 F.4th 103, 121-25 (2d Cir. 2023) (same); *cf. Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351 (2021) (in-forum sales of same *type* of product sufficient for personal jurisdiction).

*Santander* is especially relevant, however, because it rejects the precise misreading of *Charles Schwab Corp. v. Bank of America Corp.*, 883 F.3d 68 (2d Cir. 2018) ("*Schwab I*") that defendants press here. According to defendants, *Schwab I* held that in-forum transactions are insufficient to establish personal jurisdiction because plaintiffs' claims arise from defendants' "false [Euribor] submissions in [Brussels]." *See* ECF No. 170 at 23 (quoting modified excerpt of *Schwab I*, 883 F.3d at 83). But *Santander* expressly rejects this "broad[]" reading of *Schwab I*. 92 F.4th at 459-60. It holds, instead, that "Defendants' theory that jurisdiction can exist only where the price-fixing occurred makes little sense," *id.* at 460, and that "personal jurisdiction exist[s] for claims based on in-forum sales of manipulated instruments," *id.*, regardless of whether "the 'wrongdoing' underlying a claim take[s] place in the forum." *Id.* at 459.

---

[1] Plaintiffs submitted *Platinum* in a May 2, 2023 letter. Dkt. 279.

www.lowey.com

44 South Broadway, Suite 1100, White Plains, NY 10601-4459 (p) 914-997-0500 (f) 914-997-0035
One Tower Bridge, 100 Front Street, Suite 520, West Conshohocken, PA 19428 (p) 215-399-4770 (f) 610-862-9777



      Accordingly, *Santander* limits the language defendants rely on here to an unusual "free-floating fraud claim" presented in *Schwab I*, *id.* at 460, which was based "'*solely* on Defendants' false LIBOR submissions in London.'" *Id.* at 459 (this Court's emphasis). Here, by contrast, every claim is tied directly to a price-fixed instrument sold in the United States, and every defendant sold price-fixed financial instruments here. *Santander* thus confirms the Unites States courts' personal jurisdiction over this matter.

      Very truly yours,

      /s/ Vincent Briganti
      Vincent Briganti

cc:    Counsel of record via CM/ECF

www.lowey.com
44 South Broadway, Suite 1100, White Plains, NY 10601-4459 (p) 914-997-0500 (f) 914-997-0035
One Tower Bridge, 100 Front Street, Suite 520, West Conshohocken, PA 19428 (p) 215-399-4770 (f) 610-862-9777

# United States Court of Appeals for the Second Circuit

August Term 2023
Argued: October 27, 2023
Decided: February 9, 2024

No. 22-2039

OKLAHOMA FIREFIGHTERS PENSION & RETIREMENT SYSTEM, ELECTRICAL WORKERS PENSION FUND LOCAL 103, I.B.E.W., GOVERNMENT EMPLOYEES RETIREMENT SYSTEM OF THE VIRGIN ISLANDS, MANHATTAN AND BRONX SURFACE TRANSIT OPERATING AUTHORITY PENSION PLAN, METROPOLITAN TRANSPORTATION AUTHORITY DEFINED BENEFIT PENSION PLAN MASTER TRUST, BOSTON RETIREMENT SYSTEM, UNITED FOOD AND COMMERCIAL WORKERS UNION AND PARTICIPATING FOOD INDUSTRY EMPLOYERS TRI-STATE PENSION FUND, SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY, on behalf of themselves and all others similarly situated,

*Plaintiffs-Appellants*,

v.

BANCO SANTANDER (MÉXICO) S.A. INSTITUCIÓN DE BANCA MÚLTIPLE, GRUPO FINANCIERO SANTANDER MÉXICO, BBVA BANCOMER S.A., INSTITUCIÓN DE BANCA MÚLTIPLE, GRUPO FINANCIERO BBVA BANCOMER, HSBC MÉXICO, S.A., INSTITUCIÓN DE BANCA MÚLTIPLE, GRUPO FINANCIERO HSBC, BANCO NACIONAL DE MÉXICO, S.A., INSTITUCIÓN DE BANCA MÚLTIPLE, GRUPO FINANCIERO BANAMEX, BANK OF

AMERICA MÉXICO, S.A., INSTITUCIÓN DE BANCA MÚLTIPLE, GRUPO FINANCIERO BANK OF AMERICA, DEUTSCHE BANK MÉXICO, S.A. INSTITUCIÓN DE BANCA MÚLTIPLE,

*Defendants-Appellees.*[*]

On Appeal from the United States District Court
for the Southern District of New York

Before: LYNCH and PARK, *Circuit Judges*, and SUBRAMANIAN, *District Judge*.[**]

Plaintiffs in this putative class action are U.S. investors who bought Mexican government bonds. Defendants are the Mexican branches of several multinational banks, who sold bonds to Plaintiffs through non-party broker-dealers. Plaintiffs allege that Defendants fixed the bonds' prices, and they bring claims against Defendants under the Sherman Act, 15 U.S.C. §§ 1, 3, and for common-law unjust enrichment. Defendants moved to dismiss for lack of personal jurisdiction, and the District Court (Oetken, *J.*) granted Defendants' motion. Relying on *Charles Schwab Corp. v. Bank of America Corp.*, 883 F.3d 68 (2d Cir. 2018), the court concluded that it lacked jurisdiction because the alleged wrongdoing underlying Plaintiffs' claims—fixing the prices of the bonds—happened solely in Mexico. We vacate and remand because (1) Defendants had minimum contacts with New York based on solicitations and sales from the forum by their agents, the broker-dealers, and (2) Plaintiffs' claims arise from or are related to those contacts under *Schwab*. The District Court's order is **VACATED** and the case is **REMANDED** for further proceedings consistent with this opinion.

---

[*] The Clerk of Court is respectfully directed to update the caption.

[**] Judge Arun Subramanian, of the United States District Court for the Southern District of New York, sitting by designation.

MARGARET C. MACLEAN, Lowey Dannenberg, P.C., White Plains, NY (Vincent Briganti, Lowey Dannenberg, P.C., White Plains, NY, *on the brief*), *for Plaintiffs-Appellants*.

BORIS BERSHTEYN, Skadden, Arps, Slate, Meagher & Flom LLP, New York, NY (Susan Saltzstein, Kamali P. Willett, Kartik Naram, Skadden, Arps, Slate, Meagher & Flom LLP, New York, NY; Adam S. Hakki, Shearman & Sterling LLP, New York, NY; Alan Schoenfeld, Wilmer Cutler Pickering Hale and Dorr LLP, New York, NY; Paul S. Mishkin, Caroline Stern, Davis Polk & Wardwell LLP, New York, NY; Lev L. Dassin, Roger A. Cooper, Samuel Levander, Cleary Gottlieb Steen & Hamilton LLP, New York, NY; John Terzaken, Karen M. Porter, Simpson Thacher & Bartlett LLP, Washington, DC, *on the brief*), *for Defendants-Appellees*.

SUBRAMANIAN, *District Judge*:

This case involves the alleged price-fixing of Mexican government bonds. Plaintiffs are investors who bought these bonds in the United States, allegedly at inflated prices. Defendants are Mexican banks that deal in the market for the bonds. Defendants did not sell bonds to Plaintiffs directly. Instead, sales were negotiated and carried out through broker-dealers located in New York, each of which was affiliated with a Defendant. The brokers are not parties to this case and are not alleged to have been involved in the price-fixing. The complaint says that they were just Defendants' "clearinghouses."

The question in this appeal is whether there is personal jurisdiction over Defendants. Plaintiffs say yes because Defendants exploited the New York market by directing the brokers' actions in the forum. Defendants say no, arguing that the brokers' conduct should not be attributed to them. And even if it is, Defendants say that isn't enough. They argue

3

that the jurisdictional inquiry focuses on the wrongdoing underlying a plaintiff's claims, and the wrongdoing here—the alleged price-fixing—all happened in Mexico. For this argument, Defendants rely on this Court's decision in *Charles Schwab Corp. v. Bank of America Corp.*, 883 F.3d 68 (2d Cir. 2018). The District Court agreed with Defendants' reading of *Schwab* and dismissed this case. *In re Mexican Gov't Bonds Antitrust Litig.*, No. 18-CV-2830 (JPO), 2020 WL 7046837, at *5 (S.D.N.Y. Nov. 30, 2020).

Because the complaint plausibly alleges that Defendants actively sold billions of dollars' worth of price-fixed bonds through their agents in New York, we hold that personal jurisdiction was properly alleged. The judgment of the District Court dismissing the complaint on personal-jurisdiction grounds is VACATED and the case REMANDED for further proceedings.

## BACKGROUND

### I. Factual allegations

The following facts are taken from the operative complaint (the Second Consolidated Amended Class Action Complaint) except where noted. We take these allegations as true at the motion-to-dismiss stage.[1] Plaintiffs are institutional investors and filed this case on behalf of a putative class of purchasers who, between 2006 and 2017, transacted in Mexican government bonds. Defendants are the Mexico-based subsidiaries of several multinational banks. Plaintiffs allege that Defendants violated the Sherman Act, 15 U.S.C. §§ 1, 3, and were unjustly enriched by selling them price-fixed Mexican government bonds.

To understand the alleged conspiracy, start with the bonds' lifecycle. As their name suggests, the Mexican government bonds were issued by the Mexican government. The bonds were initially sold by the Mexican central bank, "Banxico," at auctions. Not everyone could participate in

---

[1] We are concerned here only with whether Plaintiffs' allegations suffice to survive a motion to dismiss. "Eventually personal jurisdiction must be established by a preponderance of the evidence, either at an evidentiary hearing or at trial." *A.I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76, 79 (2d Cir. 1993).

4

these auctions. Instead, Banxico had to approve bidders. Defendants were approved as bidders and were part of Banxico's "Market Maker Program." The members of that program were tasked with buying large chunks of bonds (collectively, they had to bid for 100% of the bonds issued), with the understanding that they would resell them for a profit.

After Defendants purchased the bonds at auction, they traded them in the over-the-counter market. To facilitate market liquidity, each Defendant agreed to quote customers both a "bid" price and an "ask" price, with a promise to buy bonds at the bid price and to sell bonds at the ask price. Defendants profited on the difference—the "bid-ask spread." (In this opinion, we focus on Defendants' sales of bonds. But Defendants also bought bonds on the open market, including from Plaintiffs.)

If a U.S. investor wanted to buy a Mexican government bond from a Defendant, it would first contact that Defendant's affiliated New York broker-dealer. Then, the broker-dealer's sales team would contact the Defendant's Mexico-based traders. The traders would quote a price for the bond, and if the investor agreed to that price, the transaction would be executed through the broker-dealer.

The brokers were middlemen. Once a trade was agreed to, the broker would contact its affiliated Defendant so that the bonds could be delivered to the investor. These trades were executed through "back-to-back" transactions: In a sale, the bonds would move from the Defendant to the broker and then to the investor. The cash paid for the bond would go to the broker and then immediately be forwarded to the Defendant.[2] So the broker was technically the investor's counterparty, but the complaint characterizes the brokers as mere "clearinghouse[s]." App'x 326, Second Am. Compl. ("SAC") ¶ 81. For example, the brokers never independently priced or marketed the bonds. Nor did they hold any inventory. The electronic transfers were also "immediate," *id.* at 336, SAC

---

[2] There are a few variations on this pattern. Santander Mexico arranged sales through a New York broker-dealer but exchanged bonds and cash with investors through a foreign affiliate, Santander Investment Bolsa, Sociedad de Valores. BBVA-Bancomer and Citibanamex transacted through New York broker-dealers just like the other Defendants, but in some instances they also exchanged bonds and cash directly with U.S. investors.

5

¶ 119, so the brokers never risked being stuck holding the bag. Perhaps most tellingly, with one exception, the brokers didn't make money on the trades. Only one U.S. broker charged a fee to its affiliated Defendant,[3] and only the Defendants' trading desks recorded profits and losses from the trades.

Plaintiffs say that Defendants conspired to fix prices at multiple points. They allege that Defendants shared pricing information and submitted fixed bids during the Banxico auctions. Plaintiffs also say that Defendants sold the bonds they purchased at auction to investors at artificially high prices. Finally, the complaint alleges that Defendants agreed to fix their bid-ask spreads—the prices quoted to customers—artificially wide. In a competitive market, Defendants would compete by narrowing their bid-ask spreads. They could attract customers by buying bonds at higher prices (raising their bid price) and selling bonds at lower prices (lowering their ask price). But they stood to gain by agreeing not to do that: Defendants' "business model in the [Mexican government bond] market [was] based on buying low and selling high, as many times as possible." *Id.* at 435, SAC ¶ 456. Wider bid-ask spreads "allow[ed] the Defendants to earn greater profits from each transaction because they equate[d] to a higher sale[s] price to the customer (*i.e.* a higher 'ask' price)." *Id.* The complaint relies on chatroom discussions among traders, economic data, and other information to support the allegation that Defendants "agreed to fix the prices that they quoted" to customers. *Id.* at 418, SAC ¶ 413.

## II.    Procedural history

Plaintiffs' prior complaint asserted claims against not only the Mexico-based Defendants in this appeal, but also dozens of Defendants' affiliates, including the New York brokers. The District Court dismissed the complaint for improper group pleading, noting that the complaint treated the defendants as a collective bloc without any defendant-

---

[3] That one broker, BBVA Securities Inc., wrote in its year-end statement of Financial Condition for 2017 that it "acts as agent on behalf of . . . [Defendant BBVA-]Bancomer in fixed income securities transactions." *Id.* at 328, SAC ¶ 87 n.11.

6

specific allegations. *In re Mexican Gov't Bonds Antitrust Litig.*, 412 F. Supp. 3d 380, 388–89 (S.D.N.Y. 2019). Plaintiffs then amended their complaint, dropping all claims against Defendants' affiliates (including the brokers) while adding specific allegations of wrongdoing by Defendants.

Defendants once again moved to dismiss, and the District Court granted the motion for lack of personal jurisdiction. *In re Mexican Gov't Bonds Antitrust Litig.*, 2020 WL 7046837, at *5. It concluded that this Court's decision in *Schwab*, which is discussed below, was "dispositive" as to "the conditions under which foreign banks may be haled into court in the United States to answer for alleged anticompetitive conduct abroad." *Id.* at *3. The District Court understood the "upshot of *Schwab*" to be that "purposeful availment in antitrust cases generally requires in-forum contacts that bear a causal relationship to defendants' *wrongdoing*, not merely to plaintiff's *harm*." *Id.* So even if Defendants had established in-forum contacts by marketing and selling bonds through affiliated broker-dealers, "a conspiracy does not 'arise from' an *ex post* attempt to profit from the conspiracy." *Id.* In the District Court's view, the claims arose from Defendants' price-fixing, which "occurred in Mexico alone." *Id.*

The court also rejected Plaintiffs' arguments for jurisdiction under two specific theories: the "effects" test and conspiracy jurisdiction. *Id.* at *4–5. And in a follow-up opinion, the court said that the Supreme Court's intervening decision in *Ford Motor Co. v. Montana Eighth Judicial District Court*, 592 U.S. ----, 141 S. Ct. 1017 (2021), did not dislodge *Schwab* as the controlling precedent in this case. *In re Mexican Gov't Bonds Antitrust Litig.*, No. 18-CV-2830 (JPO), 2022 WL 950955, at *3 (S.D.N.Y. Mar. 30, 2022). Because the complaint properly alleges jurisdiction under *Schwab*, we do not address whether there is also jurisdiction under these other theories or based on *Ford*.[4]

---

[4] Plaintiffs argue that *Ford* abrogated *Schwab* by creating a more lenient standard for personal jurisdiction than the one that *Schwab* applied. Because we find that jurisdiction is proper under *Schwab*, we need not decide whether *Ford* abrogated *Schwab* by broadening the relevant standard.

7

## LEGAL STANDARDS

We review a dismissal for lack of personal jurisdiction *de novo*. *Daou v. BLC Bank, S.A.L.*, 42 F.4th 120, 128 (2d Cir. 2022). "To defeat a motion to dismiss for lack of personal jurisdiction, a plaintiff 'must make a prima facie showing that jurisdiction exists. Such a showing entails making legally sufficient allegations of jurisdiction, including an averment of facts that, if credited[,] would suffice to establish jurisdiction over the defendant.'" *Schwab*, 883 F.3d at 81–82 (alteration in original) (quoting *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34–35 (2d Cir. 2010)). On a motion to dismiss, we "construe the pleadings and affidavits in the light most favorable to plaintiffs, resolving all doubts in their favor." *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010) (quoting *Porina v. Marward Shipping Co.*, 521 F.3d 122, 126 (2d Cir. 2008)).

## DISCUSSION

Personal jurisdiction can be general or specific. Here, Plaintiffs claim only specific jurisdiction. Typically, specific-jurisdiction analysis proceeds in two steps. First, the court applies the forum's long-arm statute. *Chloe*, 616 F.3d at 163. Second, if the long-arm statute permits the exercise of jurisdiction, the court determines whether that exercise would comport with the Due Process Clause. *Id.* at 164. Step two has two parts of its own: minimum contacts and reasonableness. *Id.* This appeal involves only whether Defendants had minimum contacts with the forum.[5]

---

[5] The parties dispute whether the relevant forum is the United States or New York. They point to one of our recent decisions that says this Court has yet to decide that question. *Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 142 n.21 (2d Cir. 2014). But there are several other cases that suggest otherwise. *U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.*, 241 F.3d 135, 152 n.12 (2d Cir. 2001) ("In determining whether personal jurisdiction exists over a foreign defendant who . . . has been served under a federal service of process provision, a court should consider the defendant's contacts throughout the United States and not just those contacts with the forum." (internal quotation marks and citations omitted)); *Chew v. Dietrich*, 143 F.3d 24, 30 (2d Cir. 1998); *Texas Trading & Milling Corp. v. Fed. Republic of Nigeria*, 647 F.2d 300, 314 (2d Cir.

"The contacts needed . . . often go by the name 'purposeful availment.'" *Ford*, 141 S. Ct. at 1024 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)). In other words, to have minimum contacts with the forum, the "defendant . . . must take 'some act by which [it] purposefully avails itself of the privilege of conducting activities within the forum State.'" *Id.* (alteration in original) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). The contacts "must show that the defendant deliberately 'reached out beyond' its home—by, for example, 'exploi[ting] a market' in the forum State." *Id.* at 1025 (alteration in original) (quoting *Walden v. Fiore*, 571 U.S. 277, 285 (2014)). And the "plaintiff's claims . . . 'must arise out of or relate to the defendant's contacts' with the forum." *Id.* (quoting *Bristol-Myers Squibb Co. v. Superior Ct.*, 582 U.S. 255, 262 (2017)).

### I. Defendants had sufficient contacts with the forum

According to Defendants, they solicited and executed the transactions through brokers. They argue that this layer of separation insulates them. But the complaint plausibly alleges that the brokers were mere pass-throughs. And for personal jurisdiction, we look through form to substance.

"It is well established that a defendant can 'purposefully avail itself of a forum by directing its agents or distributors to take action there.'" *Schwab*, 883 F.3d at 84 (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 135 n.13 (2014)). And we have indicated that a defendant avails itself of New York's forum if the defendant's "alleged agent acted in New York for the benefit of, with the knowledge and consent of, and under some control by, the nonresident principal." *Id.* at 85 (quoting *Grove Press, Inc. v. Angleton*, 649 F.2d 121, 122 (2d Cir. 1981)). So it is "plausible that an agency relationship between a parent corporation and a subsidiary that sells securities on the parent's behalf could establish personal jurisdiction over the parent in a state in which the parent 'indirectly' sells

---

1981), *overruled on other grounds by Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic*, 582 F.3d 393 (2d Cir. 2009); *Mariash v. Morrill*, 496 F.2d 1138, 1143 (2d Cir. 1974). In any event, Defendants' alleged contacts with New York are enough at this stage, so we do not reach this question.

9

the securities." *Id.* at 85–86. But a defendant can also avail itself of a forum through something less than "a formal agency relationship." *Chloe*, 616 F.3d at 168; *see also Daimler*, 571 U.S. at 135 ("Agencies . . . come in many sizes and shapes . . . .").

*Schwab* is instructive. That case involved LIBOR manipulation. LIBOR was an interest-rate average calculated by collecting information from the London branches of several multinational banks. *Schwab*, 883 F.3d at 78. Those branches allegedly conspired to manipulate the rate by reporting false information. *Id.* Some of the conspirators—the "direct seller[s]"—sold LIBOR-based financial instruments directly to the *Schwab* plaintiffs in the forum state. *See id.* at 78–79, 82–84.

But there were also "indirect sellers." *Schwab*, 883 F.3d at 79, 84. "[T]hese indirect seller Defendants sold debt instruments to [the plaintiffs] in [the forum] through non-party broker-dealer subsidiaries or affiliates." *Id.* Although these defendants "may well have purposefully availed themselves of [the forum] 'by directing their agents' to transact with [the plaintiffs] there," the *Schwab* plaintiffs' "sparse" allegations fell short. *Id.* at 86 (alterations omitted) (quoting *Daimler*, 571 U.S. at 135 n.13). The complaint there merely asserted in conclusory fashion that the defendants controlled and benefited from the brokers' activities, but it "shed[] no light on the relationship between Defendants and those broker-dealers." *Id.*

Here, that relationship is alleged. The complaint alleges that each Defendant maintained a New York sales staff "assigned to serve customers in the United States," App'x 325, SAC ¶ 76,[6] and that the Mexico-based "traders were in constant communication with their respective salesforce in the United States," *id.*, SAC ¶ 79. Moreover, Defendants actively used the broker-dealer affiliates as mere pass-throughs to execute transactions on Defendants' behalf for free, with all profits and

---

[6] *See also id.* at 334, SAC ¶ 110 (Santander Mexico); *id.* at 339, SAC ¶ 131 (BBVA-Bancomer); *id.* at 346, SAC ¶ 156 (Citibanamex); *id.* at 352, SAC ¶ 176 (Deutsche Bank Mexico); *id.* at 357, SAC ¶ 197 (HSBC Mexico); *id.* at 363, SAC ¶ 216 (Bank of America Mexico).

losses from the brokers' transactions recorded not on the brokers' accounts, but on Defendants' accounts.[7]

The complaint also details Defendants' knowledge, control, and benefit. On knowledge and control, the complaint alleges that Defendants were directly involved in every trade. The brokers "did not actually employ any individuals who were responsible for marketing, trading, or pricing" bonds. *Id.* at 326, SAC ¶ 81. Instead, Defendants' own trading desks "suppl[ied] trade ideas to the bank's salesforce to attract customers" and then priced every trade furnished and executed by their New York brokers. *Id.* at 322, SAC ¶ 67; *see also id.* at 325, SAC ¶ 77 ("For example, when a customer located in the United States contacts a New York salesperson about purchasing [bonds], the salesperson would route the customer request to a Defendant's [bond] trading desk."). The complaint alleges that this was true for each Defendant.[8] And once the New York brokers executed a deal, each Defendant arranged for the bonds to be sent from its own inventory.[9] In essence, Defendants merely "use[d] the[] broker-dealer affiliates as a clearinghouse in cross-border transactions." *Id.* at 326, SAC ¶ 81.

As for who benefited, the complaint alleges that it was Defendants on every trade. For each transaction, "the resulting gain or loss from the transaction [was] recorded in the profit and loss records of the Defendant's [Mexican] trading desk." *Id.* at 328, SAC ¶ 86. In fact, with one exception, Defendants were the only ones to benefit. Because the brokers did "not have an active role in arranging, pricing, or sourcing [the]

---

[7] As noted above, *supra* at n.1, Plaintiffs' allegations about the nature of Defendants' relationship with the identified sales forces and broker-dealers will have to be proven.

[8] *Id.* at 335, SAC ¶ 113 (Santander Mexico); *id.* at 341, SAC ¶ 137 (BBVA-Bancomer); *id.* at 348, SAC ¶ 159 (Citibanamex); *id.* at 353, SAC ¶ 179 (Deutsche Bank Mexico); *id.* at 359, SAC ¶ 201 (HSBC Mexico); *id.* at 364, SAC ¶ 219 (Bank of America Mexico).

[9] *Id.* at 336, SAC ¶¶ 116–17 (Santander Mexico); *id.* at 342, SAC ¶¶ 141–42 (BBVA-Bancomer); *id.* at 348, SAC ¶¶ 162–63 (Citibanamex); *id.* at 354, SAC ¶¶ 182–83 (Deutsche Bank Mexico); *id.* at 360, SAC ¶¶ 204–05 (HSBC Mexico); *id.* at 365, SAC ¶¶ 222–23 (Bank of America Mexico).

transactions and serve[d] purely an accounting function, they d[id] not collect a fee or markup for routing [bonds] to and from customers." *Id.*, SAC ¶ 87. And the one exception, BBVA-Bancomer's broker, expressly stated in a financial disclosure that it acted as the bank's "agent." *Id.*, SAC ¶ 87 n.11. These allegations support Plaintiffs' conclusion that the brokers "serve[d] in a passive role as an internal clearinghouse." *Id.* at 322, SAC ¶ 66. So the brokers do not shield Defendants from the exercise of jurisdiction.

Once the brokers are established as Defendants' agents for jurisdictional purposes, the agents' contacts can be "imputed" to Defendants. *Schwab*, 883 F.3d at 86. Perhaps unsurprisingly, using a New York agent as the sales hub for billions of dollars' worth of bonds subjects the principal to specific jurisdiction for claims arising from or related to that conduct. *See Katz Commc'ns, Inc. v. Evening News Ass'n*, 705 F.2d 20, 24–25 (2d Cir. 1983) (personal jurisdiction was proper when "the [New York] office was made virtually a division of the defendant's business" and the defendant's "representatives were in New York planning and executing the tactics and strategy for getting advertising contracts not merely in New York but throughout the nation"); *PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105, 1111 (2d Cir. 1997) ("[The defendant] does not claim that the letters and phone calls [his agent] made from New York constitute random or unintentional actions. [The defendant] has purposefully availed himself of the New York forum by using [his agent] in New York . . . to advance his interest in his unique 'product' through soliciting funds and negotiating royalty agreements."); *see also Asahi Metal Indus. Co. v. Superior Ct.*, 480 U.S. 102, 112 (1987) (plurality opinion) ("Additional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State, for example, . . . advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a

distributor who has agreed to serve as the sales agent in the forum State.").[10]

This is not to say that an affiliate's in-forum marketing, sales, and distribution can always be pinned to an out-of-state defendant. As *Schwab* envisioned, the defendant's knowledge of, control over, and benefit from the agent's conduct are the key considerations. This case, however, does not involve any difficult line-drawing questions. The complaint alleges that Defendants were in charge of every step of every deal, thousands of times over during the alleged class period.

## II. The claims arise from or are related to Defendants' contacts with the forum

Defendants say that even if the brokers' contacts are attributed to them, Plaintiffs' claims don't "arise from" or "relate to" those contacts under *Schwab*. As explained, the plaintiffs in *Schwab* alleged that the defendants conspired to manipulate LIBOR. Some of their claims were related to certain defendants' sales to plaintiffs of financial products tied to LIBOR. *Schwab*, 883 F.3d at 83. Other claims, however, were based not on the sales of financial products but solely on the defendants' allegedly false LIBOR submissions in London. *Id.* That is, the plaintiffs sued members of the conspiracy who had not sold them *any* LIBOR-based financial products. *Id.* at 86–87.

*Schwab* held that there was jurisdiction for the first set of claims, those related to the defendants' sales to the plaintiffs. *Id.* at 82–83. These claims included "fraud relating to *omissions* by Defendants in the course of selling floating-rate instruments, interference with prospective economic advantage, breach of the implied covenant, and unjust enrichment." *Id.* at 83. As to these claims, the Court emphasized that "[a]llegations of billions of dollars in transactions in [the forum] easily make out

---

[10] This analysis and these precedents apply equally to Santander. Although it used a foreign affiliate for its back-to-back transactions, that routing decision is insignificant. Santander's Mexican trading desk cooperated with its New York affiliate to promote the bonds, quote prices, and arrange trades. That conduct is at the heart of the allegedly price-fixed sales.

13

a prima facie showing of personal jurisdiction for claims relating to those transactions." *Id.* at 82.

However, the Court observed that in-forum sales "do not alone create personal jurisdiction for claims premised *solely* on Defendants' false LIBOR submissions in London." *Id.* at 83 (emphasis added). The Court identified one such claim: that "Defendants committed fraud through their daily LIBOR submissions to the [British Bankers' Association] in London." *Id.* This claim did not arise from the defendants' in-forum sales to the plaintiffs. Indeed, the plaintiffs asserted this fraud claim "against all Defendants, including those that did not sell any products to [the plaintiffs]." *Id.*

Defendants read this part of *Schwab* broadly. They say it requires that the "wrongdoing" underlying a claim take place in the forum, even for claims involving sales by the defendant to the plaintiff. And because the price-fixing alleged here all occurred in Mexico, Defendants say jurisdiction in New York is improper. But *Schwab* expressly rejected that argument. The district court in *Schwab* had concluded, mirroring Defendants' argument here, that "plaintiffs could establish personal jurisdiction only where a plaintiff established a prima facie case that 'defendants' LIBOR *manipulation* took place in the relevant forum.'" *Schwab*, 883 F.3d at 89–90 (quoting *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11 MDL 2262 NRB, 2015 WL 6243526, at *32 (S.D.N.Y. Oct. 20, 2015)). *Schwab* described that reasoning as "erroneous." *Id.* at 90. It held instead that there was jurisdiction over claims connected to the defendants' "sales and solicitation" in the forum. *Id.* Only the free-floating fraud claim failed.

In context, that distinction makes sense. The conspiracy alleged in *Schwab* was to manipulate LIBOR. But LIBOR itself was not bought and sold. Rather, the rate was incorporated into financial instruments that were then sold to the *Schwab* plaintiffs by some (but not all) of the alleged conspirators. The LIBOR conspiracy's object affected in-forum transactions indirectly, so *Schwab* paid special attention to the legal theories linking the manipulation and sales. Personal jurisdiction existed for claims based on in-forum sales of manipulated instruments but

14

did not exist for the one claim based solely on the allegedly fraudulent out-of-forum LIBOR submissions.

Here, the complaint alleges that Defendants rigged the product, then arranged to sell it through their agents in New York. Plaintiffs say that the prices of the bonds were fixed and that those price-fixed bonds were sold to them by the price-fixers' agents. Rather than being incorporated by reference, the wrongdoing here is baked into the product itself. So there is little need to police the line between the alleged wrongdoing and sales. As a result, the solicitations and sales here fit *Schwab*'s category of "transactions [that] easily make out a prima facie showing of personal jurisdiction." *Id.* at 82.

Indeed, the facts here present an even stronger case for jurisdiction than those in *Schwab*. While the contacts in *Schwab* were sales *into* the forum, Defendants here, through their brokers, arranged sales of bonds *from* the forum. "In determining whether personal jurisdiction is present, a court must consider . . . 'the interests of the forum State and of the plaintiff in proceeding with the cause in the plaintiff's forum of choice.'" *Bristol-Myers*, 582 U.S. at 263 (quoting *Kulko v. Superior Ct.*, 436 U.S. 84, 92 (1978)). "But the 'primary concern' is 'the burden on the defendant.'" *Id.* (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980)).

The plaintiffs in *Schwab* wanted to sue in their home forum. In some sense, the defendants were burdened by that choice. But the forum state's interest in protecting its consumers was strong, and the purported burden was less compelling because the defendants had chosen to transact with a party there. Here, by contrast, Plaintiffs want to sue Defendants where *Defendants* have allegedly elected to conduct their U.S. sales operations. New York has a strong interest in regulating businesses in the state, of course, and Defendants chose to take advantage of New York's market and laws. So they can't complain.

In the end, Defendants' theory that jurisdiction can exist only where the price-fixing occurred makes little sense. Suppose that Defendants opened a sales office in New York, staffed by their own employees, and then sold the bonds out of that office to U.S. investors at prices fixed in

15

Mexico. It could hardly be argued that Defendants' New York contacts would be insufficiently related to the price-fixing to confer jurisdiction in New York. Since the acts of the brokers here may be attributed to Defendants, the divided nature of the sales cannot change that result.

## Conclusion

For these reasons, the judgment of the District Court is VACATED and the case REMANDED for further proceedings consistent with this opinion.