# KING & SPALDING

King & Spalding LLP
1700 Pennsylvania Avenue NW
Suite 900
Washington, D.C. 20006-4707
Tel: +1 202 737 0500
Fax: +1 202 626 3737
www.kslaw.com

Paul Alessio Mezzina
Partner
Direct Dial: +1 202 626 8988
pmezzina@kslaw.com

April 15, 2024

**VIA ECF**

Ms. Catherine O'Hagan Wolfe
Clerk of Court
United States Court of Appeals for the Second Circuit
Thurgood Marshall U.S. Courthouse
40 Foley Square
New York, NY 10007

> **Re:** *Sullivan v. Barclays*, Nos. 19-1769, 19-2012

Dear Ms. Wolfe:

Defendants-appellees-cross-appellants submit as supplemental authority *City of Pontiac Police & Fire Retirement System v. BNP Paribas Securities Corp.* ("*Treasuries*"), 92 F.4th 381 (2d Cir. 2024). Plaintiffs there alleged that ten banks conspired to rig U.S. Treasury auctions (and that seven conspired to boycott potential competitors). This Court held neither conspiracy was plausibly alleged.

*Treasuries* confirms that plaintiffs' threadbare and conclusory allegations concerning the remaining defendants—RBS, UBS, Rabobank, and ICAP—do not plausibly plead that they joined a sweeping, six-year conspiracy to manipulate Euribor. *See* Doc. 241 at 50-51; Doc. 242 at 15-20; SA47 (plaintiffs' conspiracy theory is "far broader than the supporting allegations"). Many pleading flaws this Court identified in *Treasuries* are also present here:

- Plaintiffs invoke communications involving a subset of *other* defendants to infer the existence of a much broader conspiracy. *Cf. Treasuries*, 92 F.4th at 397 (chats involving "traders from only three of the ten [defendants] … cannot plausibly demonstrate that a conspiracy … existed among the seven other [defendants]").

- Plaintiffs invoke communications from 2006-2007 to infer a conspiracy affecting every Euribor setting over a six-year period. *Cf. id.* at 398-99 (refusing to infer from "bilateral chat excerpts" spanning one year that defendants "agreed to fix hundreds of Treasury auctions … over the course of eight-and-a-half years").

- Plaintiffs infer Rabobank's participation from communications with a non-defendant, non-Euribor-panel bank. *Cf. id.* at 398 (chats "between a trader from [a non-defendant] and a trader from [a defendant], not between two [defendants]," could not support "any inference that [defendants] reached an unlawful agreement").

- Plaintiffs fail to allege how ICAP, the only broker defendant, engaged in any specific acts of collusion. *Cf. id.* at 397-98 (requiring a "specific, individualized showing of" collusive behavior for each defendant).

- Plaintiffs infer conspiratorial agreement from conduct defendants allegedly engaged in "individually and separately," *id.* at 415, such as a bank adjusting its Euribor submissions based on its own trading book.

- Plaintiffs pad their complaint with communications that reflect "market chatter" but "stop well short of evincing" an unlawful agreement, plus "generic" and "conclusory" allegations that fail to differentiate among defendants. *Id.* at 396-98, 407-10.

Respectfully submitted,

*/s/ Paul Alessio Mezzina*
Paul Alessio Mezzina

*Counsel for The Royal Bank of Scotland plc
(n/k/a NatWest Markets plc)*

cc: All Counsel of Record (via ECF)

# Exhibit A

92 F.4th 381
United States Court of Appeals, Second Circuit.

CITY OF PONTIAC POLICE AND FIRE
RETIREMENT SYSTEM, on behalf of itself and on
behalf of all others similarly situated, Cleveland Bakers
and Teamsters Pension Fund, on behalf of themselves
and all others similarly situated, Cleveland Bakers
and Teamsters Health and Welfare Fund, on behalf
of themselves and all others similarly situated, Erie
County Employees' Retirement System, individually
and on behalf of all others similarly situated, IBEW
Local 640 Arizona Chapter NECA Pension Trust Fund,
on behalf of itself and all others similarly situated,
MASTERINVEST Kapitalanlage GmbH, Oklahoma
Firefighters Pension and Retirement System, individually
and on behalf of all others similarly situated, United
Food and Commercial Workers Union and Participating
Food Industry Employers Tri-state Pension Fund,
Rock Capital Markets, LLC, on behalf of itself and all
others similarly situated, Oklahoma Police Pension and
Retirement System, Boston Retirement System, The
Government Employees' Retirement System of the
Government of the Virgin Islands, Alaska Electrical
Pension Fund, on behalf of itself and all others similarly
situated, Bank of Jerusalem, Ltd., on behalf of itself and
others similarly situated, City of Atlanta Firefighters'
Pension Fund, Employees Retirement System of Rhode
Island, individually and on behalf of all others similarly
situated, UNIQA Capital Markets GmbH, on behalf
of UNIQA DOLLAR BOND individually and all
others similarly situated, Torus Capital LLC, UFCW
Local 1500 Pension Fund, Plaintiffs – Appellants,
Arkansas Teacher Retirement System, Beaver County
Employees' Retirement Fund, individually and on
behalf of all others similarly situated, Marc Federighi,
individually and on behalf of all those similarly
situated, Inter-Local Pension Fund of the Graphic
Communications Conference of the International
Brotherhood of Teamsters, Lackawanna County
Employees' Retirement Fund, Rutgers Enhanced
Insurance Company, State-Boston Retirement System,
on behalf of itself, United International Insurance
Company, United Food and Commercial Workers

Local 1776 & Participating Employers Pension Fund,
individually and on behalf of all others similarly situated,
Jonathan Richard Williamson, Policemen's Annuity &
Benefit Fund of Chicago, City of Omaha Police and
Fire Retirement System, Thomas E. Kalaway, Michael
J. Smith, individually and on behalf of those similarly
situated, CNB Bancorp, Inc., The Police Retirement
System of St Louis, M & N Trading, Marina Fouts,
on behalf of herself and all others similarly situated,
Michael St. John, Laborers Local 100 and 397 Health
and Welfare Fund, on behalf of itself and all others
similarly situated, Breakwater Trading LLC, Rogers
Varner, Jr., BWT Professional Trading, LLC, Air
Conditioning and Refrigeration Industry Retirement
Trust, on behalf of itself, and, in a representative
capacity, on behalf of all those similarly situated,
Endeavor Trading, LLC, American Federation of
Teachers, individually and on behalf of all others
similarly situated, Twin City Iron Workers Health &
Welfare Fund, on behalf of itself and all others similarly
situated, Jane Franklin, on behalf of herself and all
others similarly situated, Twin City Iron Workers
Pension Fund, on behalf of itself and all others similarly
situated, Robert L. Teel, Richard Corbett, The New
Jersey Laborers Statewide Funds, Brian Fisher, City of
Providence, Central Laborers' Pension Fund, Plaintiffs,
v.

BNP PARIBAS SECURITIES CORP., Barclays
Capital Inc., Citigroup Global Market Inc., Credit
Suisse Securities (USA) LLC, Goldman, Sachs & Co.,
HSBC Securities (USA) Inc., J.P. Morgan Securities
Holdings LLC, J.P. Morgan Securities LLC, Merrill
Lynch, Pierce, Fenner & Smith Inc., Morgan Stanley
& Co. LLC, RBS Securities Inc., UBS Securities LLC,
Tradeweb Markets LLC, Dealerweb Inc., Tradeweb
IDB Markets, Inc., JP Morgan Chase Bank, N.A., J.P.
Morgan Clearing Corp., Bank of America Corp., Michael
St. John, Barclays Bank, PLC, Defendants – Appellees,
BMO Capital Markets Corp., CIBC World Markets
Corp., Cantor Fitzgerald & Co., Commerz Markets LLC,
Countrywide Securities Corp., Daiwa Capital Markets
America Inc., Deutsche Bank Securities Inc., Jeffries
LLC, Merrill Lynch Government Securities Inc., Mizuho
Securities USA Inc., Nomura Securities International
Inc., RBC Capital Markets, LLC, SG Americas Securities

LLC, TD Securities (USA) LLC, 3RED TRADING LLC, Citigroup, Inc., Credit Suisse Group AG, The Goldman Sachs Group, Inc., Goldman Sachs Execution & Clearing L.P., JP Morgan Chase & Co., Morgan Stanley, UBS AG, Credit Suisse International, Bank of Nova Scotia, New York Agency, Bank of America, N.A., Defendants. *

No. 22-943
|
August Term, 2023
|
Argued: October 3, 2023
|
Decided: February 1, 2024

**Synopsis**

**Background:** Investors, as 18 pension and retirement funds and other investors, filed consolidated class action complaint, certified as multidistrict litigation (MDL), against ten world's largest banks, known as primary dealers in multi-trillion-dollar market for United States Treasury securities, claiming violation of Sherman Act and unjust enrichment by allegedly engaging in two interrelated conspiracies to restrain trade, namely, that all ten banks engaged in conspiracy to rig Treasury auctions by sharing sensitive proprietary information and placing collusive bids, and that subset of seven banks conspired to boycott emergence of direct trading between buy-side investors, known as all-to-all trading, on secondary market for Treasuries, including by threatening and intimidating trading platforms that sought to offer such trading. The United States District Court for the Southern District of New York, Paul G. Gardephe, J., 595 F.Supp.3d 22, granted banks' motion to dismiss for failure to state claim. Investors appealed.

**Holdings:** The Court of Appeals, Jacobs, Circuit Judge, held that:

anonymous executive's statements did not constitute direct evidence of banks' agreement to conspire to rig Treasury auctions;

online chat transcripts did not constitute direct evidence of banks' agreement to conspire to rig Treasury auctions;

statistical modeling did not constitute indirect evidence of banks' agreement to conspire to rig Treasury auctions; and

investors did not plausibly allege that banks entered agreement to conspire to use coordinated boycotts to prevent all-to-all trading on secondary market for Treasuries.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion to Dismiss for Failure to State a Claim.

**Attorneys and Law Firms**

**\*388** Michael B. Eisenkraft, Cohen Milstein Sellers & Toll PLLC, New York, NY (David O. Fisher, Cohen Milstein Sellers & Toll PLLC, New York, NY; Carol V. Gilden, Cohen Milstein Sellers & Toll PLLC, Chicago, IL; Michael P. Canty, Thomas G. Hoffman, Jr., Labaton Sucharow LLP, New York, NY; Daniel L. Brockett, Thomas Lepri, Steig D. Olson, Quinn Emanuel Urquhart & Sullivan, LLP, New York, NY; Jeremy Andersen, Quinn Emanuel Urquhart & Sullivan, LLP, Los Angeles, CA, on the brief), for Plaintiffs-Appellants.

Richard C. Pepperman II, Sullivan & Cromwell LLP, New York, NY (Jonathan S. Carter, Sullivan & Cromwell LLP, New York, NY; Robert Y. Sperling, Staci Yablon, Paul, Weiss, Rifkind, Wharton & Garrison, LLP, New York, NY, on the brief), for Defendant-Appellee Goldman Sachs & Co. LLC.

Jon R. Roellke, Morgan, Lewis & Bockius LLP, Washington, DC (Stacey Anne Mahoney, Morgan, Lewis & Bockius LLP, New York, NY, on the brief), for Defendants-Appellees Tradeweb Markets LLC, Tradeweb IDB Markets, Inc. and Dealerweb Inc.

Richard A. Rosen, Brad S. Karp, Kenneth A. Gallo, Susanna M. Buergel, Melina M. Meneguin Layerenza, Paul, Weiss, Rifkind, Wharton & Garrison, LLP, New York, NY, for Defendant-Appellee Morgan Stanley & Co., LLC.

Robert D. Wick, Covington & Burling LLP, Washington, DC (Henry B. Liu, Covington & Burling LLP, Washington, DC; S. Conrad Scott, Covington & Burling LLP, New York, NY, on the brief), for Defendants-Appellees J.P. Morgan Securities LLC, J.P. Morgan Securities Holdings LLC, JP Morgan Chase Bank, N.A. and J.P. Morgan Clearing Corp.

Adam S. Hakki, Agnès Dunogué, Benjamin Klebanoff, Shearman & Sterling LLP, New York, NY, for Defendant-Appellee BNP Paribas Securities Corp.

Matthew A. Schwartz, Kathleen S. McArthur, Sullivan & Cromwell LLP, New York, NY, for Defendant-Appellee Barclays Capital Inc.

Jay B. Kasner, Karen M. Lent, Skadden, Arps, Slate, Meagher & Flom LLP, New York, NY, for Defendant-Appellee Citigroup Global Markets Inc.

John E. Schmidtlein, Williams & Connolly LLP, Washington, DC, for Defendants-Appellees Bank of America Corp. and Merrill Lynch, Pierce, Fenner & Smith Inc.

Paul S. Mishkin, Davis Polk & Wardwell LLP, New York, NY, for Defendant-Appellee RBS Securities Inc.

Eric J. Stock, Gabrielle Levin, Gibson, Dunn & Crutcher LLP, New York, NY; Melanie L. Katsur, Gibson, Dunn & Crutcher LLP, Washington, DC, for Defendant-Appellee UBS Securities LLC.

David G. Januszewski, Elai Katz, Thorn Rosenthal, Herbert S. Washer, Cahill Gordon & Reindel LLP, New York, NY, for Defendant-Appellee Credit Suisse Securities (USA) LLC.

Before: Jacobs, Wesley and Robinson, Circuit Judges.

**Opinion**

Dennis Jacobs, Circuit Judge:

**\*389** More than twenty banks, known as primary dealers, are major players in the multi-trillion-dollar market for United States Treasuries, the debt securities that fund the federal government. Treasuries are issued in auctions held at scheduled intervals, and are traded in a secondary market.

Plaintiffs-Appellants ("Plaintiffs") are eighteen pension and retirement funds and other investors that entered into Treasury transactions, who appeal from the dismissal of these consolidated cases under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim, by the United States District Court for the Southern District of New York (Gardephe, *J.*). Plaintiffs sued ten of the dealers, contending that (1) all ten of these large banks engaged in a conspiracy to rig Treasury auctions by sharing sensitive, proprietary information and placing collusive bids; and (2) a subset of seven banks conspired to boycott the emergence of direct trading between "buy-side" investors, known as all-to-all trading, on the secondary market for Treasuries, including by threatening and intimidating trading platforms that sought to offer such trading--all in violation of Section 1 of the

Sherman Act. The auction conspiracy is alleged to have lasted roughly eight-and-a-half years, until public reporting revealed that the Department of Justice was investigating the dealers' alleged misconduct; the boycott conspiracy is based on alleged misconduct from the early 2000s all the way to the present.

The dealer-defendants ("Dealer Defendants") moved to dismiss Plaintiffs' four claims: one Sherman Act claim and one unjust enrichment claim for each of the two alleged conspiracies. Initially, the district court granted the motions with leave to amend. 🚩 In re Treasury Sec. Auction Antitrust Litig., 2021 WL 1226670, at *26 (S.D.N.Y. Mar. 31, 2021). The new allegations in the Amended Complaint, however, did not cure Plaintiffs' pleading deficiencies; so the district court dismissed their lawsuit again, this time with prejudice. **\*390** In re Treasury Sec. Auction Antitrust Litig., 595 F. Supp. 3d 22, 70 (S.D.N.Y. 2022).

We affirm the district court's judgment of dismissal along lines similar to the district court's thorough and well-reasoned opinion.

Plaintiffs fail to plausibly allege that the Dealer Defendants engaged in a conspiracy either to rig Treasury auctions or to conduct a boycott on the secondary market. The defect that is fatal to both alleged conspiracies is failure to demonstrate the existence of an agreement, whether through direct or indirect evidence. More specifically, with respect to the auctions, Plaintiffs' allegations of collusive information-sharing in online chatrooms largely amount to inconsequential market chatter; and their statistical analyses lack specificity as to the Dealer Defendants and rely on averages spread over an excessively long time. As to the alleged boycotts, Plaintiffs fail in their attempt to weave scattered, unrelated episodes involving different dealers over the course of roughly two decades into an actionable conspiratorial narrative. Such allegations do not plausibly rebut the inference that the dealers' conduct served their respective, individual, legitimate business interests to maintain a profitable and reliable market structure.

**I**

The Market. The market for U.S. Treasuries is the "deepest, most liquid, and most important" securities market in the world. JA 743 (Am. Compl. ¶ 1). It includes T-bills, which are Treasuries with maturities up to one year; T-notes, which

have maturities between one and ten years; and T-bonds, which have maturities of more than ten years. Many kinds of investors buy or sell Treasuries.

Treasuries are issued by the U.S. Treasury Department in auctions at scheduled intervals. The primary dealers place bids in every auction--both for themselves and on behalf of their customers.

The secondary market for Treasuries is active and robust: roughly $510 billion in Treasuries is traded every day, almost twice the daily volume of stock trading. This market is bifurcated into trading between dealers (known as dealer-to-dealer ("D2D")); and trading between dealers and clients (known as dealer-to-client ("D2C")) on the "buy side," which include pension and retirement funds like Plaintiffs, among other investors. According to Plaintiffs, however, buy-side clients cannot engage in "all-to-all" trading with each other, unlike with other securities.

Legal Standards. We review *de novo* the district court's dismissal of the Amended Complaint for failure to state a claim under Rule 12(b)(6). City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc., 637 F.3d 169, 173 (2d Cir. 2011). We accept the Amended Complaint's well-pleaded factual allegations as true and construe them in the Plaintiffs' favor. See id.

To avoid dismissal, the Amended Complaint must allege facts sufficient to "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). A claim is facially plausible when it provides enough factual content to support the reasonable inference that "the defendant is liable for the misconduct alleged," and presents "more than a sheer possibility" of liability. Id. The factual allegations must, at the very least, "raise a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555–56, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Plaintiffs cannot rely on mere "labels and conclusions," or "naked assertions" absent "further factual enhancement." Iqbal, 556 U.S. at 678, 129 S.Ct. 1937 (alteration omitted). These principles are fully applicable **391** in antitrust cases; there is no "heightened pleading standard." Concord Assocs., L.P. v. Ent. Props. Tr., 817 F.3d 46, 52 (2d Cir. 2016).

Sherman Act. Section 1 of the Sherman Act prohibits any "contract, combination ... or conspiracy, in restraint of trade." 15 U.S.C. § 1. Accordingly, the first question in any Section 1 case is whether there is an agreement to conspire. Plaintiffs can allege such an agreement in two ways: by direct evidence, and by indirect or circumstantial evidence.

Direct evidence of a conspiracy is "explicit" and can show one exists without any inferences. Burtch v. Milberg Factors, Inc., 662 F.3d 212, 225 (3d Cir. 2011) (internal quotation marks omitted) (quoting In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 324 n.23 (3d Cir. 2010)). An example of direct evidence would be "a recorded phone call in which two competitors agreed to fix prices at a certain level," Mayor & City Council of Baltimore, Md. v. Citigroup, Inc., 709 F.3d 129, 136 (2d Cir. 2013), or "an admission by an employee of one of the conspirators, that officials of the defendants had met and agreed explicitly on the terms of a conspiracy to raise price," In re Text Messaging Antitrust Litig., 630 F.3d 622, 628 (7th Cir. 2010).

The gun need not be smoking, however, if Plaintiffs allege sufficient indirect, circumstantial evidence. Citigroup, 709 F.3d at 136. But parallel conduct--even "conscious parallelism"--is generally insufficient, because parallel acts, even if they are "consistent with conspiracy," may nevertheless be "just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market"--or the product of "chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties." Twombly, 550 U.S. at 553–54, 556 n.4, 127 S.Ct. 1955 (internal quotation marks omitted).

Parallel conduct, therefore, needs context suggesting an antecedent agreement, rather than "parallel conduct that could just as well be independent action." Id. at 557, 127 S.Ct. 1955. Critically, allegations of parallel conduct must be reinforced by "plus factors" that provide a basis to infer that a conspiracy arose. Citigroup, 709 F.3d at 136. Such factors include "a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications."

Id. (quoting Twombly v. Bell Atl. Corp., 425 F.3d 99, 114 (2d Cir. 2005), rev'd on other grounds, Twombly, 550 U.S. 544, 127 S.Ct. 1955). [1]

* * *

Plaintiffs allege that certain primary dealers conspired to rig Treasury auctions (Part II); and to boycott all-to-all trading on the secondary market (Part III). We start with the auction allegations. In doing so, while we separately evaluate the different sets of allegations for each conspiracy, we focus on each conspiracy "as a whole." Cont'l Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 699, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962) (internal quotation marks omitted).

**\*392 II**

At Treasury auctions, primary dealers place bids for themselves and "indirect bidders." Indirect bidders include domestic money managers, foreign central banks and sovereign monetary funds. Indirect bidders convey order information--their desired price and quantity of Treasuries--for primary dealers to bid on their behalf. [2]

Primary dealers are the only market participants that must place bids for a specific percentage of the Treasuries offered at every auction, bidding at least their pro rata share relative to the number of dealers. There were twenty-four primary dealers when the Amended Complaint was filed in May of 2021, and as many as twenty-three during the class period of January 1, 2007 to June 8, 2015. Among them were the ten "Auction Defendants": Bank of America, Barclays, BNP, Citi, Credit Suisse, Goldman Sachs, JP Morgan, Morgan Stanley, RBS and UBS. [3] Within the group of twenty-plus dealers, the Auction Defendants were allegedly particularly active during the class period and accordingly received particularly large allocations at the auctions.

To understand the allegations, it is helpful to have a basic understanding of the mechanics of Treasury auctions. Bidders offer to take specified amounts of an issue at specified yields, and the Treasuries are allocated to the bidders that bid to accept the lowest yields (and corresponding highest prices), in order, until the issue is fully awarded; the remaining bids are rejected; and all the successful bidders enjoy the same yield, the "stop-out yield." [4] There are also active pre- and post-auction markets for "when issued" Treasuries, in which the primary dealers are active participants.

The class period ended on June 8, 2015, when it was first reported that the Department of Justice had opened an investigation into whether the primary dealers manipulated the Treasury market. Other federal and state governmental authorities opened their own investigations. The DOJ inquiry reportedly focused on misconduct in connection with Treasury auctions and improper sharing of such inside information as trading positions and customer orders, including in online chatrooms. More specifically, the investigations reportedly uncovered emails and chats showing that Goldman Sachs traders provided sensitive pricing information to traders at other Auction Defendants. [5] As part of its investigation, the DOJ sent information requests to "most or all" of the dealers, JA 796 **\*393** (Am. Compl. ¶ 175), and served several of the Auction Defendants with subpoenas.

None of the investigations, however, resulted in enforcement proceedings, charges, guilty pleas, settlements, or fines or disgorgement.

**A**

Plaintiffs allege that the Auction Defendants enjoyed an improper advantage at Treasury auctions from inside information that they shared with one another. Specifically, Plaintiffs contend that the Auction Defendants routinely traded competitively sensitive or confidential information, such as customer orders, in advance of auctions. This inside information-sharing allegedly enabled the Auction Defendants to build a "collective pool of knowledge" to help them predict prices and demand for upcoming auctions. JA 813 (Am. Compl. ¶ 214). More importantly, Plaintiffs continue, the inside information allowed the Auction Defendants to place optimal bids for obtaining sought-after Treasury allocations at desirable yields/prices. Thus, when the Auction Defendants knew demand at an auction was low, they could coordinate to avoid bidding low yields/high prices; and when they knew demand was high, they could coordinate to bid the low yields/high prices required to win. And Plaintiffs' statistical modeling of public Treasury auction data is said to show that the Auction Defendants exploited their inside information at the expense of other market participants.

<u>Anonymous Executive.</u> Plaintiffs heavily rely on the account of an anonymous former executive of a subsidiary of Auction Defendant UBS. Though he did not work at UBS itself, this executive "oversaw" Treasury purchases at auctions and on the secondary market for his bank and "regularly" communicated with UBS Treasury traders. JA 804 (Am. Compl. ¶ 194). This executive is said to report:

- that primary dealers engaged in "constant communications" surrounding auctions, <u>id.</u> at 805 (Am. Compl. ¶ 198);

- that Treasury traders at UBS and other primary dealers typically discussed Treasury yields in order to avoid losses and "to look good with their bosses by being connected in the marketplace," <u>id.</u> at 804 (Am. Compl. ¶ 195);

- that traders from nine of the ten Auction Defendants [6] regularly communicated in online chatrooms about: Treasury yields, spreads between auction yields and when-issued yields, and bid quantities prior to auctions "in order to obtain their desired bond allocation and yield/pricing," <u>id.</u> (Am. Compl. ¶¶ 196–97);

- that these chats usually occurred on auction days from around 7 a.m. through 1 p.m., when the auction was held; and that traders would also converse after the auction to share "who got what," <u>id.</u> at 804–05 (Am. Compl. ¶ 197); and

- that, in general, traders communicated to "get everyone on the same page," that the dealers wanted to ensure "the dealer community did not hurt themselves" at auctions, and that traders "acted as a group" by deciding whether to bid a higher or lower yield than the when-issued yield, <u>id.</u> at 805 (Am. Compl. ¶ 199).

<u>Chats.</u> To confirm the anonymous executive's account of improper information **\*394** sharing, Plaintiffs proffer five bilateral chats occurring over a one-year span: August 2011 to August 2012. In these chats, traders from an anonymous primary dealer, designated Primary Dealer X, chatted with traders from one of three Auction Defendants: Credit Suisse, Morgan Stanley or RBS.

In an August 2011 chat, a Credit Suisse trader told a Primary Dealer X trader about a potential trade he might execute in connection with an upcoming auction, as well as his general view on the auction. In response, the Primary Dealer X trader said he sold $200 million in five-year Treasuries at a specific price. Below is the chat excerpt:

> <u>Credit Suisse Trader 1</u>: I think it [the auction] goes fine. If 5-10-30 gets up to -18/-19 on strong auction I am going to sell it
>
> <u>Primary Dealer X Trader 1</u>: I sold 200 5s at 103-01

JA 808 (Am. Compl. ¶ 206 (alteration in original)).

In the same chat, the Primary Dealer X and Credit Suisse traders went on to discuss, among other things, pricing for a completed trade and their customer books.

> <u>Credit Suisse Trader 1</u>: doing alright. Long some 3yrs on the curve. 1-2 is 3bps in coups, 2-3 is 14. I think 3yrs have some room to go
>
> ....
>
> <u>Primary Dealer X Trader 1</u>: just filled pie holes at 19
>
> ....
>
> <u>Primary Dealer X Trader 1</u>: ANY BOOK
>
> <u>Credit Suisse Trader 1</u>: nothing notable
>
> <u>Primary Dealer X Trader 1</u>: NOTHING HERE

<u>Id.</u> at 808–09 (Am. Compl. ¶ 207).

In another August 2011 chat, the same Primary Dealer X trader and a different Credit Suisse trader discussed customer books, market activity and their views about an upcoming auction for seven-year Treasuries--including whether it would "tail," that is, fail to attract a high level of demand.

> <u>Credit Suisse Trader 2</u>: what you think for 7yr? I'm thinking tail if we here at 21+....
>
> <u>Credit Suisse Trader 2</u>: other guys on our desk think it will go better than that
>
> .....
>
> <u>Primary Dealer X Trader 1</u>: i don't know what to think[ ]
>
> <u>Primary Dealer X Trader 1</u>: there has been a lot of buyi[ng] by [J]apan today
>
> <u>Credit Suisse Trader 2</u>: in 7s? I did not see any of that

Primary Dealer X Trader 1: 5s and 7s

Primary Dealer X Trader 1: about 600 [million] 7s

Credit Suisse Trader 2: ok thanks

Primary Dealer X Trader 1: so far no book

Credit Suisse Trader 2: same here

Id. at 809–10 (Am. Compl. ¶ 208 (fourth alteration in original)).

In January 2012, a different Primary Dealer X trader and a RBS trader chatted about an upcoming auction for thirty-year Treasury bonds, including their order books.

Primary Dealer X Trader 2: no bids. no interesting client chatter. one big buyer of zeroes. got some backup, probably get a bit more, and she goes fine, you?

RBS Securities Trader 1: same, underwhelmed by interest so far

Id. at 810 (Am. Compl. ¶ 209).

In August 2012, yet another Primary Dealer X trader and a Morgan Stanley trader discussed an upcoming auction, highlighting particular indirect bidders **\*395** (pension and insurance funds). The Morgan Stanley trader also suggested that it was unlikely primary dealers--the "street," i.e., "st"-- would be active bidders.

Morgan Stanley Trader 1: still don't think guys are short enough, although the level brings in the real money wildcard

Primary Dealer X Trader 3: i agree with you. still not sure how much RM [i.e., "real money," institutional investors such as pension and insurance funds] wants to load up here. i think they are a little scared by the price action. i think we tail small and see pension insurance scooping some. what u think.

Morgan Stanley Trader 1: big tail is a chance.

Primary Dealer X Trader 3: 8/2011 style? would take it

Morgan Stanley Trader 1: not that big. But from here 2+ is a chance. st has no bid here.

Id. at 811 (Am. Compl. ¶ 210).

Also in August 2012, the same Primary Dealer X trader and a different Credit Suisse trader discussed setting up a "persistent chat" and proceeded to discuss their customer books. Id. at 812 (Am. Compl. ¶ 211).

Credit Suisse Securities Trader 3: Figured we should make a persistent chat

Primary Dealer X Trader 3: love it

Primary Dealer X Trader 3: seeing buying here man

Primary Dealer X Trader 3: in 10s

Primary Dealer X Trader 3: ....

Primary Dealer X Trader 3: FM [fast money, e.g., proprietary trading firms] and RM [real money, e.g., institutional investors] painful

Credit Suisse Securities Trader 3: I wonder if its guys covering shorts... get em out of the auc[ti]on process could be good

Credit Suisse Securities Trader 3: We have a light book

Primary Dealer X Trader 3: no book

Id. (first and second alteration in original).

Data Modeling. Plaintiffs' modeling of Treasury auction data from the class period and afterward is said to support their overarching claim that, during the class period, the Auction Defendants conspired to rig auctions in their favor and to the detriment of other market participants by improperly sharing inside information and placing collusive bids. According to Plaintiffs, there were statistically significant changes in the data around June 8, 2015--when the DOJ investigation was first reported--that resulted from the conspiracy breaking up.

None of Plaintiffs' analyses, however, use data about the Auction Defendants in particular. Instead, they rely on statistics about all twenty-plus primary dealers, and other unspecific data. Also, the statistics mostly consist of averages covering roughly ten years--from eight years before to two years after the purported unraveling of the conspiracy in June of 2015.

Plaintiffs make a number of specific statistical claims, none of which make plausible a conspiracy to rig Treasury auctions. Among other data, they cite variations in allocations to

primary dealers and indirect bidders; predictability of yields in the spot and when-issued markets; ranges of accepted-bid yields depending on the demand level in the auctions; and the level of activity in the pre-auction, when-issued market.

## B

We agree with the district court that Plaintiffs do not state a claim under Section 1 of the Sherman Act based on the alleged conspiracy to rig Treasury auctions. **\*396** Viewing the allegations collectively, Plaintiffs fail to plausibly plead either direct or indirect evidence of an agreement. The only direct evidence cited is information-sharing alleged by the UBS subsidiary executive and evinced in the chat transcripts, which largely constitutes innocuous market shop-talk. The indirect evidence pleaded is statistical modeling, which is not focused specifically on the Auction Defendants and improperly relies on averages spread over a long span of time. Accordingly, Plaintiffs do not plausibly allege parallel conduct among the Auction Defendants.

Anonymous Executive. Plaintiffs contend that statements by the former UBS subsidiary executive constitute direct evidence of a conspiracy. As the district court concluded, they do not.

First of all, Plaintiffs fail to allege that the executive was in a position to know whether a conspiracy existed. The executive worked at a subsidiary of Auction Defendant UBS, not UBS itself, and Plaintiffs clearly distinguish these two entities. See, e.g., JA 803–04 (Am. Compl. ¶ 194 (describing him as a "former senior executive at a subsidiary of Defendant UBS, who reported to the Chief Executive Officer of that subsidiary")). [7] True, the executive "oversaw" Treasuries purchases for his bank and "regularly" communicated with UBS Treasury traders. Id. But this does nothing to repair the defect that, by virtue of the executive's employment at a non-UBS entity, he was removed from the specifics of the alleged improper information sharing. Plaintiffs do not demonstrate that this executive relayed anything more than, at best, secondhand information or chatter. This is far from the sort of smoking gun that courts look for when assessing whether there is direct evidence of an agreement.

🔖 Citigroup, 709 F.3d at 136.

The executive's account, as Plaintiffs report it, is chiefly generic descriptions of participants in the alleged

discussions. For example, the Amended Complaint describes "communications between traders at the primary dealer banks" and chatrooms that "typically included most of the major dealers," and otherwise lumps together the twenty-plus primary dealers. JA 804–06 (Am. Compl. ¶¶ 195–201).

Such references do not reveal whether--and, if so, which-- of the Auction Defendants' traders participated in the alleged conversations or, more broadly, the conspiracy. See 🔖 Ricciuti v. N.Y.C. Transit Auth., 941 F.2d 119, 123 (2d Cir. 1991) ("[Federal Rule of Civil Procedure 8(a)] is designed to permit [each] defendant to have a fair understanding of what the plaintiff is complaining about and to know whether there is a legal basis for recovery." (emphasis added));

🔖 Twombly, 550 U.S. at 565 n.10, 127 S.Ct. 1955 (complaint likely fails to provide sufficient notice under Rule 8 when it "mention[s] no specific time, place, or person involved in the alleged conspiracies," so "a defendant seeking to respond to plaintiffs' conclusory allegations ... would have little idea where to begin"); see also 🔖 Iqbal, 556 U.S. at 678, 129 S.Ct. 1937 (Rule 8 "demands more than an unadorned, the- defendant-unlawfully-harmed-me accusation"). This failure to identify the involvement of particular defendants in the alleged conspiracy, a basic pleading defect, is a feature of the Amended Complaint that, as explained below, dooms many of its other allegations as well--as to both the supposed auction and boycott conspiracies. See, e.g., 🔖 In re Zinc Antitrust Litig., 155 F. Supp. 3d 337, 384 (S.D.N.Y. 2016) (Forrest, J.) ("[A]t the **\*397** pleading stage in [an] antitrust case ... each defendant is entitled to know how he is alleged to have conspired, with whom and for what purpose."); In re European Gov't Bonds Antitrust Litig., 2020 WL 4273811, at *15 (S.D.N.Y. July 23, 2020) (Marrero, J.) (plaintiff must plead facts "to tie specific defendants to the conspiracy"); In re Mexican Gov't Bonds Antitrust Litig., 412 F. Supp. 3d 380, 388 (S.D.N.Y. 2019) (Oetken, J.) (appeal filed, dkt. 22-2039)

("Post- 🔖 Twombly authorities overwhelmingly hold that a complaint that provides no basis to infer the culpability of the specific defendants named in the complaint fails to state a claim.").

The only notable, specific exception with respect to the executive's account is his statements that traders from nine of the ten Auction Defendants (all but Citi) "routinely discussed [auction] yields and spreads to [w]hen [i]ssued yields and bid quantities" before Treasury auctions. JA 804 (Am. Compl. ¶¶ 196–97). This allegation fails for a more

fundamental reason: it does not demonstrate the existence of an agreement to rig Treasury auctions, as required for Plaintiffs to state an antitrust claim. Even allowing that these discussions occurred "in order to obtain [traders'] desired bond allocation and yield/pricing," there is no allegation showing that they furthered an antecedent agreement. Id. (Am. Compl. ¶ 196). Rather, the executive's account, as a whole, depicts traders merely sharing market color--far from the sort of actionable information that traders could use to game Treasury auctions. The executive himself stated that traders engaged in these discussions, at least in part, "to look good with their bosses by being connected in the marketplace." Id. (Am. Compl. ¶ 195). The traders, therefore, had "legitimate reasons to communicate" that do not support the existence of a conspiracy. In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig., 801 F.3d 758, 763 (7th Cir. 2015).

The executive asserted that traders communicated to "get everyone on the same page"; that they "acted as a group" when deciding whether to bid a lower or higher yield than when-issued yields; and that they wanted to ensure "the dealer community did not hurt themselves" at auctions. JA 805 (Am. Compl. ¶ 199). But these hazy, unmoored contentions are no more compelling than the rest of the executive's account. See Iqbal, 556 U.S. at 678, 129 S.Ct. 1937.

To the extent that Plaintiffs attempt to present the executive's statements as indirect evidence of a conspiracy, they cannot do so largely for reasons we have already explained. A second-hand account of market chatter among an undifferentiated group of unknown banks does not allow us to infer the existence of a conspiracy any more than it directly evidences one. See Elevator Litig., 502 F.3d at 50 (Twombly requires that a complaint "contain enough factual matter (taken as true) to suggest that an agreement [to engage in anticompetitive conduct] was made" (internal quotation marks omitted)).

Chats. Plaintiffs argue that the online chat transcripts rise to direct evidence of a conspiracy. We agree with the district court that they do not.

To begin, the chat participants comprise traders from only three of the ten Auction Defendants: Credit Suisse, Morgan Stanley and RBS. Accordingly, the transcripts cannot plausibly demonstrate that a conspiracy to systematically tilt Treasury auctions existed among the seven other Auction Defendants. See, e.g., GSE Bonds Antitrust Litig., 396 F.

Supp. 3d 354, 363 (S.D.N.Y. 2019) (Rakoff, J.) ("[W]hile the Court finds it entirely plausible that the conspiracy evidenced by the chatroom logs **\*398** may have extended beyond the specific defendants participating in those conversations, plaintiffs must still adduce some reason to believe that the particular defendants named in this suit were involved.");

Sonterra Capital Master Fund Ltd. v. Credit Suisse Grp. AG, 277 F. Supp. 3d 521, 556 (S.D.N.Y. 2017) (Stein, J.) ("Given the lack of a coherent explanation for each defendants' participation in the alleged conspiracy, an antitrust claim can stand only against those defendants as to whom the Complaint offers some specific, individual showing of ... manipulation through collusion with third parties.").

Even as to the three Auction Defendants that participated in the chats, the transcript excerpts fail to evidence a conspiracy. All of the chats occurred between a trader from Primary Dealer X and a trader from an Auction Defendant, not between two Auction Defendants. This undermines any inference that even these three Auction Defendants reached an unlawful agreement. Moreover, only five excerpts are cited, [8] all of which reflect chats that took place over the course of a full year (August 2011 and August 2012), a small slice of the eight-and-a-half-year class period. The effect of these discussions cannot have been to rig any Treasury auctions besides those that took place during this one-year period and that were the subject of the chats. As for these relatively limited number of auctions, there is no basis to conclude that the three named Auction Defendant-participants conspired to manipulate the auctions themselves. See Heart Disease Research Found. v. Gen. Motors Corp., 463 F.2d 98, 100 (2d Cir. 1972) ("[A] bare bones statement of conspiracy or of injury under the antitrust laws without any supporting facts permits dismissal.").

Nor does the content of the chat excerpts help Plaintiffs. Not once do a Primary Dealer X trader and a trader from Credit Suisse, Morgan Stanley or RBS agree to coordinate their bids at Treasury auctions. Instead, the conversations largely consist of market chatter, such as the traders' views on upcoming auctions and the market more generally, as well as completed transactions. See, e.g., JA 808–10 (Am. Compl. ¶¶ 206 ("I think it [the auction] goes fine." (alteration in original)); 208 ("there has been a lot of buyi[ng] by [J]apan today"); 207 ("just filled pie holes at 19")). Even the discussions about bidding and trading strategies or positions and customer books stop well short of evincing any kind of agreement to manipulate auctions. The traders' expressions of

uncertainty about how auctions will unfold likewise undercut any argument that their outcomes were controlled by planned collusive bidding strategies. See, e.g., id. at 810 (Am. Compl. ¶ 208 ("I dont know what to think[ ]" about the upcoming auction for seven-year Treasuries)).

Idle "shop talk" of this sort "often occurs between persons in the same field of endeavor," and does not come close to evincing a bid-rigging conspiracy. Krehl v. Baskin-Robbins Ice Cream Co., 664 F.2d 1348, 1357 (9th Cir. 1982). Even Plaintiffs' counsel compared these discussions to how "a bunch of guys get in chat rooms to talk about Yankees games." Oral Argument Audio Recording at 8:49–53.

Insofar as Plaintiffs rely on the chat transcripts as indirect evidence of a conspiracy, they are insufficient mostly for the reasons adduced above. The **\*399** Amended Complaint calls upon us to conclude, based on five bilateral chat excerpts confined to one full year, that three banks agreed to fix hundreds of Treasury auctions that occurred over the course of eight-and-a-half years. See In re Commodity Exch., Inc., Gold Futures & Options Trading Litig., 328 F. Supp. 3d 217, 228 (S.D.N.Y. 2018) (Caproni, J.) ("[A]nalysis of inter-firm communications is not mechanical, and the probative value of such evidence depends on the participants, the information exchanged, and the context ...."). [9]

Data Modeling. Plaintiffs assert that their modeling of Treasury auction data amounts to indirect evidence of a conspiracy. As the district court concluded, it does not.

Plaintiffs' statistics are fundamentally flawed because they do not focus on the ten Auction Defendants in particular. Instead, the data concern all the twenty-plus primary dealers, or the Treasury securities themselves. For example, Plaintiffs contend that the "primary dealers" had more success at obtaining their desired Treasury allocations at auctions compared to other bidders before the DOJ investigation was reported than afterward. JA 819–25 (Am. Compl. ¶¶ 228–44). According to Plaintiffs, it does not matter that they lack auction success data for the specific Auction Defendants because these ten banks dominated the Treasury market; all ten were "top-13 dealers." Plaintiffs' Br. 37 (citing data on Treasury transactions with the New York Fed).

None of this, however, changes the undisputed fact that Plaintiffs' statistics are not tailored to the banks they are suing. Instead, only certain analyses are tied to the primary dealers, but even these do not separate the Auction Defendants--who, for our purposes, would be the only dealers that matter--from the dozen or so other banks in that group. Without this necessary specification, Plaintiffs' "bald assertion[ ]" of conspiracy among the Auction Defendants is insufficient. Amron v. Morgan Stanley Inv. Advisors Inc., 464 F.3d 338, 344 (2d Cir. 2006) (quoting Leeds v. Meltz, 85 F.3d 51, 53 (2d Cir. 1996)).

Even if the Auction Defendants dominated Treasury auctions, as Plaintiffs contend, the pleaded data obscure whether any of the Auction Defendants--and if so, which--were driving the supposed market irregularities. Data on the primary dealers' conduct in connection with auctions submerge the Auction Defendants' particular conduct--about which the statistics say nothing. A conspiracy is characterized by an agreement among its members; it cannot be alleged solely by reference to some (much) broader group of which they are a subset. See, e.g., Ziglar v. Abbasi, 582 U.S. 120, 153, 137 S.Ct. 1843, 198 L.Ed.2d 290 (2017) ("Conspiracy requires an agreement **\*400** ... between or among two or more separate persons.").

As a whole, the data's lack of proper focus undermines any attempt to show that the Auction Defendants changed their behavior at Treasury auctions once the DOJ investigation came to light. See GSE, 396 F. Supp. 3d at 365 ("[T]he statistics do not plausibly suggest that the particular defendants named in this suit were part of [the] conspiracy. ... Several of plaintiffs' figures do not distinguish at all between defendant and non-defendant dealers."). [10]

The statistics are flawed in another way as well: their reliance on averages spread over an excessively long time. Plaintiffs' theory is that ten banks colluded to manipulate numerous Treasury auctions over the course of eight-and-a-half years and abruptly shut down their scheme once they came under the regulatory spotlight in June of 2015 with the reporting of the DOJ investigation. It is alleged that Plaintiffs' statistics back up this narrative by showing "sudden shifts in behavior" among the Auction Defendants. Plaintiffs' Br. 37.

But the data mostly consist of averages spanning roughly ten years--from eight years before to two years after the conspiracy allegedly broke up. Of course, averages are not useless; as Plaintiffs point out, economists and econometricians use them as part of their "standard practice." JA 817 (Am. Compl. ¶ 225). Even so, they can "flatten

or hide trends that might tell a different story," and they can be finessed by shifting the time periods being averaged. GSE, 396 F. Supp. 3d at 364. Those potential problems are particularly relevant here. The long time spans on either side of the alleged unraveling of the conspiracy would mask any rapid shifts in behavior that occurred in response to the DOJ investigation surfacing on June 8, 2015. Even if the data during the class period were different than the data in the two years after it, Plaintiffs' models do not show *when* the data changed relative to the end of the class period.

Consider Plaintiffs' assertion that primary dealers received a higher average allocation of Treasuries at auctions before June 8, 2015 than afterward. In particular, the dealers' allocation percentage for two-year notes dropped from roughly 50% during the class period to roughly 35% after it. But the timing of that decline is unclear. These statistics would be unremarkable if--as may be--the dealers had an allocation percentage of 75% during the first half of the class period, 25% in the second half, and then saw a 10 percentage-point *increase* in their allocation percentage after the class period. In that event, the dealers would have obtained more two-year notes, on average, after the DOJ investigation was reported--in contravention of Plaintiffs' theory.

Two of Plaintiffs' statistical analyses bear closer scrutiny, as they purport to show a break in the Auction Defendants' behavior around mid-2015, coinciding with **\*401** reports of regulatory scrutiny. One of them pertains to the "auction success" statistic described above. Plaintiffs claim that one of their models, which has different break points for the alleged conspiracy, best explains the change in the primary dealers' success using "mid-to-late 2015" as the break point. JA 823 (Am. Compl. ¶¶ 239–40). Because the model's explanatory power appears to peak much closer to the beginning of 2016 than early-June of 2015, however, the model does not clearly demonstrate a defined shift around June 8, 2015.

The Amended Complaint also contains a series of charts with individually plotted dots representing the difference between Treasury auction yields and spot, or market, yields for auctions during the class period and afterward. Larger gaps allegedly suggest manipulation. Again, Plaintiffs fail to demonstrate a clear break in June of 2015. Rather, many of the differentials between auction and market yields were larger after the class period than during it, particularly early in that period, vitiating any inference that the Treasury market was no longer subject to manipulation after the DOJ investigation came to light.

In their entirety, plaintiffs' statistics--like the UBS subsidiary executive's account and the chat transcript excerpts, whether considered on their own or together--fail to demonstrate parallel conduct. See Mexican Gov't Bonds, 412 F. Supp. 3d at 389–90 (rejecting plaintiffs' statistical allegations because some of them "do not distinguish between Defendants and non-defendant auction participants *at all*," and "[t]hose that do distinguish rely on 'averages' and medians ... that obscure any given Defendant's contribution to an observed trend"). Even if the data reflected parallelism, they would do so only as to the primary dealers, as opposed to the Auction Defendants in particular. In any event, the data could have changed over time for any number of reasons that together render collusive bid-rigging implausible. See, e.g., Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 307d3 (4th & 5th eds., 2018–23) ("Areeda & Hovenkamp") ("[T]he mere fact that firms are rational profit maximizers in the same market implies that they will do a fair number of things in parallel fashion.").

Because Plaintiffs fail to allege parallel conduct with respect to the alleged auction conspiracy, they cannot demonstrate an agreement to conspire based on indirect evidence irrespective of their plus factors.

## III

Plaintiffs allege a boycott conspiracy by seven of the primary dealers: Bank of America, Barclays, Citi, Credit Suisse, Goldman Sachs, JP Morgan and Morgan Stanley. Plaintiffs assert that these seven "Boycott Defendants" [11] have preserved and enforced the bifurcated structure of the secondary market for Treasuries using coordinated boycotts.

The secondary market for U.S. Treasuries consists of: (1) "on-the-run" Treasuries--those issued most recently for a Treasury of a particular maturity; and (2) "off-the-run" Treasuries--those issued before those that are on the run. Trading in on-the-run Treasuries accounts for most of the secondary-market trading.

Primary dealers dominate the secondary market's "sell side" and are the largest source of on- and off-the-run Treasuries for buy-side investors. Upon request from buy-side investors, dealers provide price quotes at which they will "bid" for (purchase) **\*402** or "offer" (sell) a Treasury, and dealers

profit off the "spread" between their (higher) offer and (lower) bid prices.

The secondary market for Treasuries is bifurcated. In the dealer-to-dealer (D2D) segment, primary dealers trade with each other and with other sell-side traders--increasingly, with principal trading firms ("PTFs"), also known as high-frequency traders ("HFTs"). In light of the increased participation of PTFs and HFTs, the dealers now account for a minority share of D2D trading, although they remain predominant players in the secondary market writ large. By contrast, in the dealer-to-client (D2C) segment, dealers trade with buy-side investors. However, Plaintiffs assert, unlike secondary markets for other securities, there is no segment in which buy-side investors trade Treasuries with each other: "all-to-all" trading.

D2D trading occurs primarily on three platforms: BrokerTec, eSpeed and Dealerweb. These platforms use an anonymous central limit order book protocol ("CLOB") that, according to Plaintiffs, is advantageous to traders. D2C trading is mostly done on two platforms, Tradeweb and Bloomberg, which use a request-for-quotes ("RFQ") protocol that Plaintiffs claim is inferior to the CLOB protocol. The anonymous CLOB protocol allows traders to see and trade using the best available prices; whereas under the RFQ protocol, buy-side investors must reveal their identities, as well as valuable trade information to their primary dealer-counterparties as a prerequisite to executing trades.

Plaintiffs allege that the Boycott Defendants colluded to boycott existing or new electronic trading platforms that sought to offer all-to-all trading for buy-side investors, and to otherwise prevent D2D platforms from opening up to such investors, including by transferring or threatening to transfer their liquidity and transaction fees away to other platforms. Plaintiffs assert that the Boycott Defendants accomplished this, in part, using a company they controlled, Tradeweb Markets, which began operating a D2D platform called Dealerweb (together with Tradeweb Markets, the "Platform Defendants"). According to Plaintiffs, Tradeweb Markets operated Dealerweb in order to threaten other platforms at the Boycott Defendants' direction by offering a platform to which the Boycott Defendants might transfer their liquidity and fees if the other platforms ever offered all-to-all trading. The Boycott Defendants' overall goal for this scheme, Plaintiffs aver, was to avoid being disintermediated--cut out as the middleman--from secondary-market transactions.

All-to-all platforms exist for other securities, such as corporate bonds and Treasury futures. In Plaintiffs' view, the Treasury market has characteristics that lend it to all-to-all trading, such as high liquidity, standardization, fungibility, low credit risk, high trade volume, quick trade settlement, and many different kinds of investors; and it is technologically feasible to launch an all-to-all platform. Plaintiffs also contend that such a platform is in the economic self-interests of the Boycott Defendants and Platform Defendants because, among other reasons, there is a "first-mover" advantage to be had. JA 922 (Am. Compl. ¶ 487). Plaintiffs therefore assert that an all-to-all platform should be up and running by now, but for an ongoing conspiracy among the Boycott Defendants and Platform Defendants.

### A

As the district court concluded, Plaintiffs do not state a claim under Section 1 of the Sherman Act with respect to the alleged conspiracy to boycott all-to-all trading on the secondary market for Treasuries. Plaintiffs fail to plausibly plead the existence **\*403** of an agreement. See Twombly, 550 U.S. at 557, 127 S.Ct. 1955 (explaining the "need at the pleading stage for allegations plausibly suggesting (not merely consistent with) agreement," which reflects Rule 8's basic pleading standard). With one exception identified infra Section III.B, Plaintiffs rely on indirect (rather than direct) evidence. And in doing so, they largely fail to plausibly allege parallel conduct. Even if they had, however, we have considered Plaintiffs' plus factors together and found them wanting. See infra note 17.

Assessing the allegations in their entirety, Plaintiffs' theory of conspiracy calls upon us to connect dots far flung among isolated episodes involving different subsets of defendants over two decades. The most Plaintiffs plausibly allege is that the Boycott Defendants, along with some or all of the other primary dealers, pursued their own respective business interests, preferred to maintain a reliable and profitable market structure, and were averse to major market changes or reforms that might disadvantage them. And Plaintiffs fail to plausibly show that the Platform Defendants were tools that the Boycott Defendants used to craft a coherent, actionable boycotting scheme.

Again, although we evaluate each set of allegations separately, we do so only as part of our assessment of the

alleged conspiracy as a whole. See ⬜ Union Carbide, 370 U.S. at 699, 82 S.Ct. 1404. The allegations are insufficient for the following overarching reasons (among other reasons explained below):

- Many of the allegations long predate and are not plausibly connected to allegations within the class period.

- Because the Boycott Defendants are similarly situated participants in the same market, their objections to all-to-all trading are ones they would naturally have in common, absent any agreement.

- Rational economic self-interest provides a ready explanation for the Boycott Defendants' supposed failure to patronize or invest in enterprises that could disrupt their business model.

- Allegations of threats, warnings, intimidation or pressure from one or more of the Boycott Defendants reflect economically rational self-interest.

- The allegations mostly consist of unspecific activities of the "primary dealers" or "Boycott Defendants," fail to sufficiently specify which (if any) Boycott Defendants furthered the alleged conspiracy or how they did so, and are otherwise vague or ill-defined. As with the alleged auction conspiracy, see supra at 396–97, the prevalence of this pleading failure in the Amended Complaint compels us to identify it repeatedly.

- When particular Boycott Defendants are named in reference to a particular episode, it is typically no more than a few of them.

- The term "Boycott Defendants" presupposes a coherent group that is not plausibly alleged to cohere by either direct or indirect evidence.

- Some of the allegations do not fit Plaintiffs' conspiracy theory--that the Boycott Defendants sought to prevent the widespread emergence of all-to-all trading.

- The Boycott Defendants are, implausibly, said to have deliberately impaired a platform run by a company in which they were major stockholders in order to demonstrate their ability to ruin other platforms.

As evidence of the boycott conspiracy, Plaintiffs allege discrete episodes, some of **\*404** which predate the boycott

class period of November 15, 2013 to the present (B), and some of which coincide with that period (C).

### B

Plaintiffs allege three separate episodes in the time predating the class period: the launch of BrokerTec and the Boycott Defendants' related agreements; the Boycott Defendants' response to eSpeed allowing Citadel and the Global Electronic Trading Company ("GETCO") to trade on its platform, and introducing a new pricing feature; and the Boycott Defendants' response to the BrokerTec-MarketAxess Alliance. Plaintiffs cite only the first of these three episodes as direct evidence of a conspiracy, and claim that the other two amount to indirect evidence. As the district court held, these early allegations do not constitute plausible evidence of conspiracy in the relevant period.

BrokerTec Launch. The D2D trading platform eSpeed was launched in 1999, fourteen some odd years before the beginning of the class period. eSpeed became the dominant D2D platform within nine months of its launch. In 2000, "a group of primary dealers" launched BrokerTec "as a competing platform" in the D2D trading segment. JA 891 (Am. Compl. ¶ 387). At the time, the Boycott Defendants or their predecessors in interest owned and controlled BrokerTec.

In late 2001, the Boycott Defendants entered into Activity Incentive Plan ("AIP") agreements pursuant to which each of them agreed to move a prescribed volume of transactions to BrokerTec or pay a fine for not doing so. The Boycott Defendants proceeded to transfer trades from eSpeed to BrokerTec, which doubled BrokerTec's market share at eSpeed's expense.

The DOJ's antitrust division reportedly opened an investigation into BrokerTec, which was then sold to a D2D dealer called ICAP in a transaction "hastened" by the DOJ investigation. Id. at 892 (Am. Compl. ¶ 390). As part of the sale, ICAP, BrokerTec and BrokerTec's Boycott Defendants-owners agreed to Revenue Commission Agreements ("RCAs") requiring the Boycott Defendants to prepay millions to ICAP in BrokerTec commissions; this incentivized primary dealers to transfer their liquidity to BrokerTec. The RCAs included a non-compete clause prohibiting groups of three or more Boycott Defendants from purchasing equity in new electronic trading platforms

that offered all-to-all Treasury trading. The DOJ approved the sale of BrokerTec to ICAP--which was completed in mid-2003--subject to the condition that the RCAs exempt certain Treasuries. There is no allegation that the DOJ took any enforcement action or brought charges against the dealers, let alone the Boycott Defendants as a group or any subsets of that group.

Plaintiffs argue that these allegations are direct evidence of a conspiracy (and, as a fallback, indirect evidence as well). One problem with Plaintiffs' allegations is time. eSpeed began operating in 1999; and, allegedly in response to the threat posed by eSpeed, BrokerTec was launched a year later. The Boycott Defendants then entered into the related AIP and RCA agreements shortly thereafter: in 2001 and before mid-2003, respectively. Plaintiffs do not plausibly tie these events to the class period, which began in November 2013, more than ten years later. Plaintiffs argue that allegations of a conspiracy can predate the class period; but Plaintiffs' early allegations do not plausibly suggest the existence of a conspiracy.

BrokerTec's launch and the related agreements fail to support the existence of **\*405** a conspiracy on their own terms. For one thing, the Amended Complaint makes clear that the launch of BrokerTec was not anticompetitive, but rather designed to *increase competition* in the D2D segment after eSpeed quickly became dominant. Id. at 891 (Am. Compl. ¶ 387 (BrokerTec launched "as a competing platform"));

see 🚩 Twombly, 550 U.S. at 566, 127 S.Ct. 1955 (plaintiff must "invest[ ] either the action or inaction alleged with a plausible suggestion of conspiracy"). Moreover, the Boycott Defendants sold BrokerTec to ICAP in mid-2003, further severing any link Plaintiffs now seek to draw to the class period.

Finally, as with the DOJ investigation into Treasury auctions, the DOJ investigation into BrokerTec does not amount to direct evidence of a conspiracy--which must be "explicit" and require no inferences. 🚩 Burch, 662 F.3d at 225 (quoting 🚩⚠ Ins. Brokerage, 618 F.3d at 324 n.23). Nor, for reasons already explained, does the investigation circumstantially allow the inference that a conspiracy existed. Because Plaintiffs do not allege any enforcement action taken or charges brought as a result of the investigation, "[i]t is far from clear that a[ ] ... government investigation involving Defendants would, in the absence of more substantial allegations, weigh in favor of the complaint's plausibility."

Mexican Gov't Bonds, 412 F. Supp. 3d at 390; see 🚩 Hinds Cnty., Miss. v. Wachovia Bank N.A., 620 F. Supp. 2d 499, 514 (S.D.N.Y. 2009) (Marrero, *J.*) (holding that "the various investigations, inquiries, and subpoenas do not make the [complaint's] allegations plausible" when there was "no indication from any of these proceedings that wrongdoing of the kind alleged has occurred").

Citadel and GETCO. In 2003, a decade before the start of the class period, eSpeed allowed two PTFs, Citadel and GETCO, to trade on its D2D platform. At the time, primary dealers viewed PTFs as threats because their algorithmic trading was superior to the dealers' electronic trading--a concern unrelated to the emergence of widespread all-to-all trading.

The Boycott Defendants "voiced their displeasure" to eSpeed's owner, Cantor Fitzgerald. JA 895 (Am. Compl. ¶ 404). The dealers that registered the "strongest opposition" were Goldman Sachs, Morgan Stanley and Citi--only three of the seven Boycott Defendants and of the approximately two dozen primary dealers. Id. And when Cantor Fitzgerald met with "each dealer," these similarly situated market participants in the same line of commerce all lodged the same complaint: the D2D market was "broken," and they were "unable to compete" with Citadel and GETCO. Id. at 895–96 (Am. Compl. ¶ 404).

Separately, eSpeed implemented a "Price Improvement" feature on its platform that allowed participants to pay higher fees in order to "improve their bids and offers." Id. at 896 (Am. Compl. ¶ 405). The dealers were averse to this feature because they believed it would cause them to try to outdo each other by paying more--without winning additional bids. Their opposition, therefore, was not predicated on resistance to widespread all-to-all trading. Supposedly in response to eSpeed's moves, unnamed Boycott Defendants "punished" the platform by transferring transactions away from eSpeed to BrokerTec, which drove down eSpeed's market share. Id. (Am. Compl. ¶ 406).

As a threshold matter, like Plaintiffs' prior set of allegations, these are stale. eSpeed allowed Citadel and GETCO onto its platform in 2003, ten years before the beginning of the class period. In any event, this episode does not advance the conspiracy narrative that the Boycott Defendants collectively shunned platforms that either supported all-to-all trading among buy-side **\*406** investors, or otherwise sought to alter the secondary Treasury market's bifurcated structure by opening up to such investors.

The Boycott Defendants' resistance to Citadel and GETCO--two PTFs-trading on eSpeed was predicated on the PTFs' advanced algorithmic trading, which the Boycott Defendants feared would render them uncompetitive. Today--that is, as the alleged conspiracy lingers on--the Boycott Defendants no longer have such concerns about PTFs. Id. at 897 (Am. Compl. ¶ 409 ("After initially opposing the participation of PTFs on the D2D platforms ... the Boycott Defendants grew to tolerate the PTFs' presence there ....")). The primary dealers, moreover, are now relatively minor players in the D2D market that eSpeed served--thanks to the rise of the very group of traders of which Citadel and GETCO were a part: PTFs. Nowhere do Plaintiffs plausibly allege that the Boycott Defendants' complaints about Citadel and GETCO were based on eSpeed opening up altogether to buy-side investors or all-to-all trading. Plaintiffs admit, for example, that the PTFs that now trade on D2D platforms are not buy-side investors.

The same flaw inheres in the allegation that the Boycott Defendants opposed eSpeed's price improvement feature. Plaintiffs contend that unnamed primary "dealers" believed this feature caused dealers to pay more without winning additional bids by creating a cycle of dealers trying to outpay each other. Id. at 896 (Am. Compl. ¶ 405). As an initial matter, this allegation is flawed insofar as it is not even attributed to dealers designated as the "Boycott Defendants," much less any particular Boycott Defendant. See, e.g., Litovich v. Bank of Am. Corp., 568 F. Supp. 3d 398, 435–37 (S.D.N.Y. 2021) (Liman, *J.*) (appeal filed, dkt. 21-2905) (dismissing claims of conspiracy to boycott electronic trading platforms in corporate-bond market because complaint did not "contain allegations as to any individual Defendant that would establish that such Defendant engaged in a group boycott"); see also European Gov't Bonds, 2020 WL 4273811, at *18–20 (dismissing claims of price-fixing conspiracy in European government bond market against defendants for whom allegations were insufficiently specific).

In any event, however disadvantageous for the dealers, this pricing feature has nothing to do with buy-side investors or all-to-all trading. It would be "only natural anyway" for the dealers to take their business away from eSpeed because they did not like its new feature. Twombly, 550 U.S. at 566, 127 S.Ct. 1955.

**BrokerTec-MarketAxess Alliance.** In 2004, roughly a decade before the start of the class period, ICAP and trading platform MarketAxess formed an alliance to offer Treasuries trading to MarketAxess's buy-side clients using a CLOB protocol on BrokerTec. The Amended Complaint makes the conclusory allegation that the Boycott Defendants were "unified" in opposition to the alliance. JA 894 (Am. Compl. ¶ 398).

It is alleged that Boycott Defendants "spoke directly with BrokerTec to demand that BrokerTec discontinue the partnership"; but the only named entity is Merrill Lynch (later acquired by Boycott Defendant Bank of America). Id. (Am. Compl. ¶ 399). And unspecified Boycott Defendants threatened that they would transfer their liquidity to a different platform if BrokerTec did not disband its alliance with MarketAxess. BrokerTec, which "got pressure" from unnamed "Boycott Defendants," eventually informed MarketAxess that it would not renew their contract. Id. But one of the Boycott Defendants, JP Morgan, actually "assist[ed]" the BrokerTec-MarketAxess **\*407** alliance. Id. (Am. Compl. ¶ 398).

To begin, similarly to the prior two sets of allegations, these predate the class period by nearly a decade. Even if the allegations were current, Plaintiffs name only a single Boycott Defendant that threatened BrokerTec in connection with the MarketAxess partnership (Merrill Lynch (later acquired by Bank of America)). See, e.g., GSE Bonds, 396 F. Supp. 3d at 364 ("[T]here must be something in the complaint that ties each defendant to the conspiracy."). Plaintiffs' concession that a different Boycott Defendant, JP Morgan, "assist[ed]" the alliance militates against any argument that the Boycott Defendants worked in tandem to undo it. JA 894 (Am. Compl. ¶ 398).

Plaintiffs rely on vague allegations that attribute conduct or motives to the group they designate the Boycott Defendants--or to a subset thereof, or to some larger group of which they are a part--and that are in other ways likewise ill-defined. As pointed out in connection with the alleged auction conspiracy, failure to specify the anticompetitive conduct of particular defendants is a theme of the entire Amended Complaint that undermines many of its allegations respecting both purported conspiracies. See, e.g., Elevator Litig., 502 F.3d at 50–51 (rejecting allegations of an agreement when complaint listed alleged conspiratorial activity "in entirely general terms without any specification of any particular activities *by any particular defendant*" (emphasis added) (internal quotation

marks omitted)); [flag] In re Interest Rate Swaps Antitrust Litig., 2018 WL 2332069, at *15 (S.D.N.Y. May 23, 2018) (Engelmayer, *J.*) (holding that complaint's "persistent claims as to the motivations or actions of 'the Dealer Defendants' as a general collective bloc, or generalized claims of parallel conduct, must ... be set aside"); Mexican Gov't Bonds, 412 F. Supp. 3d at 387 (dismissing claims that bank-defendants conspired to rig government-bond auctions and manipulate secondary-market pricing because complaint "fail[ed] to differentiate among Defendants"). [12]

For example, Plaintiffs claim that Merrill Lynch and "other Boycott Defendants" demanded that BrokerTec terminate its alliance with MarketAxess, and that BrokerTec was pressured by "other Boycott Defendants." JA 894 (Am. Compl. ¶ 399). But Plaintiffs never name these other defendants.

Some of Plaintiffs' other allegations as to the BrokerTec-MarketAxess alliance are altogether lacking in focus: that "[t]hroughout the period 2000 through at least 2007 (and perhaps even through **\*408** 2010)," Credit Suisse, Goldman Sachs and Merrill Lynch "regularly threatened BrokerTec when they were unhappy with BrokerTec's actions." Id. at 895 (Am. Compl. ¶ 401). This claim is untethered to the BrokerTec-MarketAxess partnership in particular, sweeping in years of unhappiness and threats both before and after its dissolution--without specifying the nature of the threats. These allegations do not provide "enough factual matter (taken as true) to suggest that an agreement was made." [flag] Twombly, 550 U.S. at 556, 127 S.Ct. 1955.

## C

Other allegations mostly concern events that took place roughly a decade or more later, within the class period (November 15, 2013 to the present). There are four such sets of allegations: the Boycott Defendants' response to NASDAQ's attempt to offer all-to-all trading on eSpeed; the Boycott Defendants' launch and use of Tradeweb Markets-owned Dealerweb to threaten other platforms; the Boycott Defendants' response to attempts by buy-side investors, chiefly PIMCO, to trade on BrokerTec and eSpeed; and the Boycott Defendants' response to start-up platforms DirectMatch and OpenDoor seeking to offer all-to-all trading. We agree with the district court that these allegations--all of which take the form of purported indirect evidence--fail to support the existence of a conspiracy.

NASDAQ-eSpeed. In 2013, NASDAQ acquired eSpeed and signaled that it intended to allow all-to-all trading on its D2D platform. According to a news report, NASDAQ encountered "stiff resistance" from the Boycott Defendants soon after the acquisition was announced. JA 899 (Am. Compl. ¶ 417 (internal quotation marks omitted)). Unspecified Boycott Defendants proceeded to "collectively" transfer their liquidity away from eSpeed, causing it to lose 10% of its market share to BrokerTec. Id. at 900 (Am. Compl. ¶ 418).

eSpeed officials decided to have separate meetings with officials at each of the Boycott Defendants. The Boycott Defendants, which all occupy a similar position in a similar market, raised the same complaints: eSpeed "could not be trusted"; "we heard you are going all-to-all"; and "other dealers are telling us that you are going to open to the buy-side and go to exchange." Id. at 901 (Am. Compl. ¶ 420 (internal quotation marks omitted)). Goldman Sachs and Barclays officials "asked about all-to-all" in these meetings; no threats or pressure or intimidation is alleged. Id. Moreover, unnamed Boycott Defendants, "via their [unnamed] ecommerce guys," warned that they would remove even more liquidity if eSpeed allowed buy-side investors onto its platform. Id.

eSpeed tried to assure the Boycott Defendants that it would not open up its platform to buy-side investors; "[b]ut the Boycott Defendants were not placated." Id. (Am. Compl. ¶ 421). "Throughout the Boycott Class Period"--as opposed to this alleged episode in particular--"the Boycott Defendants continued to complain about eSpeed being untrustworthy" and to pull liquidity from eSpeed, even though eSpeed had not opened up to the buy side. Id. For instance, Morgan Stanley did not trade on eSpeed for close to two years after NASDAQ acquired it, and Royal Bank of Canada--which is not a Boycott Defendant--stopped trading on eSpeed altogether with limited exceptions.

One problem with these allegations is that they are mostly generic and undifferentiated, and categorize the alleged wrongdoers as a group of "Boycott Defendants" or "dealers" without further specification. See, e.g., [flag] Litovich, 568 F. Supp. 3d at 437 ("The Complaint here is replete with allegations **\*409** that refer to Defendants as a collective bloc and assert generalized claims of parallel conduct, but it fails to connect any individual Defendant to the alleged conspiracy."). Thus, although Plaintiffs allege that Boycott Defendants lodged identical "complaints" in separate meetings with eSpeed executives, JA 900–01 (Am. Compl.

¶¶ 419–20), the Amended Complaint specifies just three of the seven Boycott Defendants (Barclays, Goldman Sachs and Morgan Stanley) as attending these meetings, and states that only two of them (Goldman Sachs and Barclays) "asked about all-to-all," id. at 901 (Am. Compl. ¶ 420); no threat is alleged.

More importantly, there is nothing sinister about the Boycott Defendants taking issue with the prospect of eSpeed offering all-to-all trading. It is decidedly not indicative of a conspiracy that a group of similarly situated market participants would object, individually and separately, to a significant market development that could cut into their profits--a broad point applicable to the alleged boycott conspiracy writ large. As the Supreme Court has explained, "resisting competition is routine market conduct"; and "if alleging parallel decisions to resist competition were enough to imply an antitrust conspiracy, pleading a ⚑ § 1 violation [of the Sherman Act] against almost any group of competing businesses would be a sure thing." ⚑ Twombly, 550 U.S. at 566, 127 S.Ct. 1955; see ⚑ Citigroup, 709 F.3d at 138 (plaintiffs must show conduct "flowed from a preceding agreement rather than from [defendants'] own business priorities"); see also ⚑ In re Musical Instruments & Equip. Antitrust Litig., 798 F.3d 1186, 1194 n.8 (9th Cir. 2015) (common motive for increased profit "always exists").

Plaintiffs otherwise resort to vague, unspecific statements, quoted above, that representatives of the "Boycott Defendants" allegedly made to eSpeed executives. Among other good reasons that these allegations are unavailing, the Boycott Defendants' lack of trust in eSpeed is a general complaint that they made "[t]hroughout" the class period, which began in November of 2013 and continues to the present. JA 755, 901 (Am. Compl. ¶¶ 35, 421). Moreover, Plaintiffs contend that the Boycott Defendants continued to pull liquidity and fees from eSpeed even after it reassured them that it did not intend to open up to buy-side investors and its "strategy and offerings did not change." Id. at 901 (Am. Compl. ¶ 421). The "only one plausible inference," ⚑ Citigroup, 709 F.3d at 139, that these allegations support is, assuming *arguendo* the Boycott Defendants did boycott eSpeed, it was not directed against NASDAQ's attempt to offer all-to-all trading on eSpeed after acquiring it in 2013. But even that assumption is unavailable because Plaintiffs identify only one Boycott Defendant, Morgan Stanley (as well as one non-defendant, RBC), that stopped trading on eSpeed.

**Dealerweb.** Plaintiffs claim that the Boycott Defendants used the Platform Defendants to effect boycotts of all-to-all trading for buy-side investors. Platform Defendant Tradeweb Markets was created and owned by several Boycott Defendants until 2004, when it was sold to Thomson Reuters. Four years later, a group of primary dealers that included most of the Boycott Defendants repurchased a roughly 40% ownership interest in Tradeweb Markets; the remaining Boycott Defendants bought stakes later; and an unknown number of Boycott Defendants also "assured their control" over Tradeweb Markets through appointments to its board of directors and governance and operating committees. JA 903 (Am. Compl. ¶ 429).

In 2008, Tradeweb Markets purchased an entity that would later be known as **\*410** Dealerweb (the other Platform Defendant), which became a wholly owned subsidiary of Tradeweb Markets. Six years later, Tradeweb Markets began operating Dealerweb as a D2D Treasury trading platform.[13] According to Plaintiffs, the Boycott Defendants pursued this platform solely to reinforce their threat to other D2D platforms--namely, BrokerTec and eSpeed--that they could move their transactions elsewhere if they desired. More specifically, Dealerweb's only alleged purpose was to serve as a repository for the Boycott Defendants' liquidity if BrokerTec or eSpeed allowed buy-side investors to trade on their platforms. In Plaintiffs' telling, Dealerweb was otherwise useless to the Boycott Defendants.

According to the Amended Complaint, Dealerweb has a relative "lack of operations": it has a small market share and subpar technology, it is not profitable, and the Boycott Defendants have barely used it. Id. at 906 (Am. Compl. ¶ 438). To Plaintiffs, this indicates that "[t]he Boycott Defendants do not operate Dealerweb as a normal business." Id. (Am. Compl. ¶ 439).

In 2019, Tradeweb Markets, the company through which the Boycott Defendants have allegedly run Dealerweb as a money-losing venture, went public and thereby became beholden to its shareholders. Two years later, Tradeweb Markets purchased from NASDAQ the entity previously known as eSpeed (and then known as NASDAQ Fixed Income). Tradeweb Markets indicated that eSpeed would be incorporated into the Dealerweb D2D platform.

These allegations suffer from a flaw that is evident *passim*: they are generic and bundle together the Boycott Defendants or primary dealers. For example, Plaintiffs allege that, as

of 2010, "the Boycott Defendants and other primary dealers collectively held sixteen of the twenty-six seats" on the Tradeweb Markets board of directors. Id. at 903 (Am. Compl. ¶ 429). Unstated is how many of those sixteen seats were held by the seven Boycott Defendants. See, e.g., Zinc Litig., 155 F. Supp. 3d at 384 ("Mere generalizations as to any particular defendant--or even defendants as a group--are insufficient.").

More fundamentally, Plaintiffs rely on speculation that the Boycott Defendants, with the help of the Platform Defendants, spearheaded a new D2D platform for no reason other than to threaten other platforms (namely, BrokerTec or eSpeed) that might alter the secondary Treasury market's bifurcated structure; and that Tradeweb Markets, through its ownership of Dealerweb, was a willing and able vessel for this alleged intimidation. For example, Plaintiffs make the conclusory assertion that the Boycott Defendants--and, by extension, Tradeweb Markets--sought to launch Dealerweb "to create a powerful, visible reminder to other [D2D] platforms that the Boycott Defendants controlled a platform to which they could move their combined liquidity, should they choose to do so." JA 904 (Am. Compl. ¶ 433). Plaintiffs offer no basis for inferring an anticompetitive motive. See Twombly, 550 U.S. at 556–57, 127 S.Ct. 1955 (plausibility requirement "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement"); e.g., RxUSA Wholesale Inc. v. Alcon Laby's, 391 F. App'x 59, 61 (2d Cir. 2010) (summary order) (affirming district court's dismissal of Sherman Act claim when plaintiff's allegations of an agreement were "entirely conclusory"). The launch and operation of Dealerweb was "in line with a wide swath of rational and competitive business strategy" that does not suggest a conspiratorial agreement. **\*411** Twombly, 550 U.S. at 554, 127 S.Ct. 1955; see Citigroup, 709 F.3d at 138 (no inference of conspiracy could be drawn when defendants' alleged conduct "made perfect business sense"). If anything, given Brokertec and eSpeed's dominance in the D2D market, the launch of Dealerweb is better characterized as a venture that *enhanced competition*. See Elevator Litig., 502 F.3d at 51 (similar conduct can "suggest competition at least as plausibly as it can suggest anticompetitive conspiracy").

Plaintiffs point to Dealerweb's "lack of operations" since its launch as confirmation that the Boycott Defendants pursued it for a conspiratorial motive. JA 906 (Am. Compl. ¶ 438).

The history of Tradeweb Markets, which owns Dealerweb, belies any such rationale. Tradeweb Markets was partly owned by Thomson Reuters when Dealerweb was launched in mid-2014 and is now a public company beholden to its shareholders. As a consequence, Plaintiffs cannot plausibly contend that Tradeweb Markets has and continues to run Dealerweb as a money-losing venture that exists solely as a "Sword of Damocles" over any platform that considers offering all-to-all trading. Id. (Am. Compl. ¶ 439); see RxUSA, 391 F. App'x at 61 (Sherman Act claim failed when "the alleged parallel activities ... 'when viewed in light of common economic experience,' could 'just as well be independent action' " (quoting Twombly, 550 U.S. at 556–57, 127 S.Ct. 1955)). Not once do Plaintiffs assert that any Boycott Defendants used Dealerweb to threaten--let alone effect--a transfer of liquidity or transactions away from BrokerTec or eSpeed in response to any decision made or action taken by either platform. [14]

PIMCO. Plaintiffs assert that the Boycott Defendants threatened BrokerTec and eSpeed when buy-side investors requested access to their D2D platforms. Plaintiffs focus, in particular, on PIMCO, a "major participant in the Treasury market" that tried to access BrokerTec and eSpeed on several occasions. JA 907 (Am. Compl. ¶ 441).

When PIMCO requested access to BrokerTec in 2008, unnamed Boycott Defendants allegedly "threatened a group boycott" of that platform. Id. (Am. Compl. ¶ 443). Five years later, when PIMCO and eSpeed were close to an agreement, the deal fell through because of unspecified "dealer intimidation" of eSpeed. Id. at 907–08 (Am. Compl. ¶ 443). Eric Noll of NASDAQ, eSpeed's owner, opined that the reasons PIMCO could not join the platform were that "this backlash is killing our market share and that the dealers were boycotting eSpeed." Id. at 908 (Am. Compl. ¶ 443 (internal quotation marks and alteration omitted)).

PIMCO also tried to trade on BrokerTec through Wells Fargo's broker-dealer subsidiary in 2014. Wells Fargo agreed to facilitate this trading for PIMCO. But Plaintiffs claim that, once the Boycott Defendants learned of this arrangement, they threatened to boycott BrokerTec as a "group," without specifying which Boycott Defendants learned of the arrangement or were part of this "group." Id. (Am. Compl. ¶ 445). BrokerTec "complied" with this **\*412** alleged threat; and the PIMCO-Wells Fargo agreement fell through. Id.

Finally, PIMCO also tried to access both BrokerTec and eSpeed in 2015–16. Negotiations advanced with both platforms, and an exchange of written agreements would have allowed PIMCO to begin trading on them. But after learning of these deals, JP Morgan "intervened," along with "other Boycott Defendants"; neither the nature of the intervention nor the particular Boycott Defendants (besides JP Morgan) are specified. Id. (Am. Compl. ¶ 446). "Many of the Boycott Defendants" then transferred their liquidity away from BrokerTec and eSpeed. Id. BrokerTec and eSpeed again allegedly "caved" to this "pressure" and abandoned their agreements with PIMCO. Id.

First of all, like many of Plaintiffs' other allegations, these are ill-defined. They rely on catchall descriptions of the dealers or Boycott Defendants as a group, see In re ICE LIBOR Antitrust Litig., 2020 WL 1467354, at *5 (S.D.N.Y. Mar. 26, 2020) (Daniels, J.) (faulting plaintiffs for not "offer[ing] any evidence of motive that is specific to any one Defendant"); and they fail to specify how the Boycott Defendants resisted buy-side participation--namely, from PIMCO--on BrokerTec and eSpeed, instead relying on empty words like "threatened" and "intimidation," see e.g., Litovich, 568 F. Supp. 3d at 410 ("The Complaint does not include any specific allegations regarding this 'pressure,' who specifically applied it, and how it was applied."); see also Alaska Dep't of Revenue, Treasury Div. v. Manku, 2021 WL 3027170, at *4 (2d Cir. July 29, 2021) (summary order) (affirming dismissal of alleged conspiracy in secondary government bond market when the complaint "[did] not allege sufficient factual detail to establish the plausibility of the claimed conspiracy").

The lone exception is Plaintiffs' allegation that JP Morgan "intervened" when it learned of impending deals that would allow PIMCO to trade on BrokerTec's and eSpeed's platforms. JA 908 (Am. Compl. ¶ 446). The Amended Complaint does not say what this intervention consisted of, cf. Interest Rate Swaps Litig., 2018 WL 2332069, at *15 (rejecting as "conclusory" allegations that "some Dealers sought to bring other Dealers into line" with respect to withholding support from trading platform); it only notes that "[m]any of the Boycott Defendants" started transferring their liquidity away from the two platforms--without naming these defendants, JA 908 (Am. Compl. ¶ 446). Nor does the Amended Complaint identify any other Boycott Defendants that intervened, asserting, instead, that there were "other Boycott Defendants" involved. Id.; see Manku, 2021 WL 3027170, at *4 (concluding that plaintiffs "fail[ed] to link each of the defendants individually to specific acts of anticompetitive conduct in furtherance of the conspiracy").

Plaintiffs concede that the Boycott Defendants did not oppose these platforms admitting certain buy-side investors. Plaintiffs do not really explain how this selective opposition coheres with their conspiratorial theory--except to assert that these investors trade in small volumes or conduct trades that are unprofitable or somehow "toxic." JA 909 (Am. Compl. ¶ 448).

Startups. It is alleged that the Boycott Defendants tried to prevent startup platforms--in addition to existing platforms BrokerTec and eSpeed--from offering all-to-all Treasuries trading between buy-side investors on their platforms. Plaintiffs focus on two such startup platforms--Direct Match and OpenDoor--as indirect evidence of a conspiracy. But it is unremarkable that a group of the world's largest banks, which have well-established, profitable operations **\*413** in the secondary Treasury market, would independently forgo supporting--and decide to not nurture--a pair of fledgling startups. See Citigroup, 709 F.3d at 137 (counseling against "propelling defendants into expensive antitrust discovery on the basis of acts that could just as easily turn out to be rational business behavior as they could a proscribed antitrust conspiracy"). Plaintiffs have not alleged enough to make their claims "conceivable," let alone "nudge[ ]" them "across the line from conceivable to plausible." Twombly, 550 U.S. at 570, 127 S.Ct. 1955.

*Direct Match*. Direct Match received either expressions of intent or commitments from dozens of buy-side investors, including PIMCO. Direct Match tried to attract liquidity providers, like the Boycott Defendants, by charging lower fees than other D2D platforms. Direct Match executives also met with executives of most of the Boycott Defendants.

The Boycott Defendants could have easily concluded that trading on this unproven startup was not in their individual business interests. Some of these Boycott Defendant executives were said to have been "open in their opposition"--mostly by making murky statements of purported disapproval. JA 910 (Am. Compl. ¶ 451). For example, Morgan Stanley representatives told Direct Match executives that "they were not going to get far"; and that "[y]ou don't have a chance. We know this is where it's going." Id. (internal quotation marks and emphasis omitted). And Morgan Stanley's anonymous "electronic people" said

Morgan Stanley would not "be the one to push the ball forward." Id. (emphasis omitted).

Complaints were lodged by "[o]ther Boycott Defendants" that Direct Match would prevent them from providing a "tailored experience" to their customers. Id. at 911 (Am. Compl. ¶ 452). The Boycott Defendants separately told Direct Match--in an allegedly nefarious way--that "we are going to watch you." Id. A Bank of America executive also told Direct Match: "Why would we mess up what we have?" Id. (emphasis omitted). "All of the other major dealers had similar sentiments," including some that "laugh[ed] Direct Match out of the room." Id.

Plaintiffs allege that the Boycott Defendants tried to block all-to-all trading on Direct Match by complaining to a third party: State Street. State Street was one of the approximately 160 members of the Fixed Income Clearing Corporation ("FICC") and had access to its clearing services. Direct Match, which was not a FICC member, sought to enlist State Street as an FICC sponsor that could submit Direct Match's trades to the FICC. Direct Match and State Street entered into an agreement on those terms. By contrast, many FICC members did not assist Direct Match because, according to Plaintiffs, they "anticipat[ed] backlash" from the Boycott Defendants. Id. (Am. Compl. ¶ 454). But these FICC members were also being asked to take the conceded "risk" of helping "an innovator," i.e., Direct Match. Id. Ultimately, setting aside State Street, none of the scores of other FICC members-- which the Boycott Defendants were not alleged to have threatened--chose to support a novelty.

In March of 2016, once Direct Match's all-to-all platform was ready to open, State Street backed out, citing a conflict of interest based on State Street's part ownership of a different Treasuries trading platform. Plaintiffs implausibly allege that this conflict was a "pretext," and that unspecified Boycott Defendants provided the "real opposition" by "collectively threaten[ing] to boycott State Street" through the withholding of their trading and banking services. Id. at 912 (Am. Compl. ¶¶ 456–57).

 **\*414** Again, Plaintiffs' Direct Match allegations are characterized by generic references to the Boycott Defendants or dealers, and vague descriptions of the nature of the alleged misconduct. See 🚩Litovich, 568 F. Supp. 3d at 437 (observing that, "[w]ith regard to the actual boycott activity itself ... the Complaint is almost entirely devoid of allegations about any specific defendant," a defect "fatal to

Plaintiffs' boycott claims"). True, the Amended Complaint specifically describes one meeting between Direct Match executives and representatives of one Boycott Defendant, Morgan Stanley. Even this account, however, is laden with imprecise and nebulous quotations--namely, the remarks by Morgan Stanley representatives to Direct Match executives that "they were not going to get far," that "[y]ou don't have a chance" and that "[w]e know this is where it's going"; and the comment by Morgan Stanley's unnamed "electronic people" that Morgan Stanley was "not going to be the one to push the ball forward." JA 910 (Am. Compl. ¶ 451 (internal quotation marks and emphases omitted)). These innocuous phrases might be sinister only if said by a mobster.

Plaintiffs discount "obvious alternative explanation[s]" for the Boycott Defendants' alleged conduct. 🚩Twombly, 550 U.S. at 567, 127 S.Ct. 1955. For example, Plaintiffs point out that some Boycott Defendants stated they opposed Direct Match because it would prevent them from providing a "tailored experience" to their customers. JA 911 (Am. Compl. ¶ 452). This is merely a more specific way of saying that working with Direct Match was not in these Boycott Defendants' individual business interests. See 🚩Iqbal, 556 U.S. at 680, 129 S.Ct. 1937 (explaining 🚩Twombly's holding that defendants' conduct "did not plausibly suggest an illicit accord because it was not only compatible with, but indeed was more likely explained by, lawful, unchoreographed free-market behavior").

As to the unraveling of State Street's agreement with Direct Match to facilitate Direct Match's access to FICC clearing services: State Street told Direct Match that it was withdrawing from the agreement because of a conflict of interest with another electronic trading platform that it owned. This is a reasonable explanation (even a compelling one); and State Street continued to work with that other, competing platform. [15] Moreover, none of the other (approximately) 160 FICC members besides State Street--not allegedly pressured by the Boycott Defendants--helped Direct Match access FICC clearing services. Plaintiffs can do no better than a drive-by assertion that these FICC members "anticipat[ed] backlash from the Boycott Defendants." JA 911 (Am. Compl. ¶ 454).

*Open Door.* In April of 2017, a different startup, OpenDoor, launched an all-to-all platform for off-the-run Treasuries. OpenDoor had onboarded many investors with significant assets, as well as six primary dealers, including Bank of Nova Scotia and Société Générale (neither of which is

a Boycott Defendant). Other investors with major assets, along with five other dealers, were prepared to join them. OpenDoor subsequently expanded its platform to on-the-run Treasuries--in which most of the secondary-market trading for Treasuries occurs. Plaintiffs' lone allegation **415** is that the Boycott Defendants have not been "publicly identified as being supporters of, or active participants in, OpenDoor"-- unlike Bank of Nova Scotia and Société Générale. Id. at 917 (Am. Compl. ¶ 470). [16] That said, "information on who provided liquidity to OpenDoor does not appear to be publicly available," meaning it is possible that the Boycott Defendants actually did provide liquidity to OpenDoor. Id. OpenDoor subsequently stopped operating.

Plaintiffs' OpenDoor allegations are even less availing than their allegations about Direct Match. Plaintiffs provide nothing--no threats, pressure, boycotts, or anything else--to show that the Boycott Defendants caused, or to otherwise connect them to, the eventual closure of OpenDoor. The most they come up with is that, unlike two other primary dealers, none of the Boycott Defendants have been "publicly identified as being supporters of, or active participants in, OpenDoor." Id. Plaintiffs even concede that they do not know whether any of the Boycott Defendants *did* support OpenDoor by providing liquidity to it. See id. (no publicly available "information on who provided liquidity to OpenDoor").

Even if the Boycott Defendants did not support OpenDoor, however, "an allegation of parallel conduct and a bare assertion of conspiracy will not suffice." ⚑ Twombly, 550 U.S. at 556, 127 S.Ct. 1955. [17]

When taken together, the boycott allegations are even weaker than when taken in series. The Amended Complaint, in sum, offers data points scattered over more than twenty years, many of them outside the class period; sketches conduct by largely unspecified actors, many of them anonymous; relies on the terminology of conspiracy, without an agreement to conspire; uses labels like "threat" and "intimidation" without substance; and describes conduct as easily indicative of common interests held, individually and separately, by the Boycott Defendants as any conspiracy.

\* \* \*

For the foregoing reasons, we **AFFIRM** the district court's judgment dismissing Plaintiffs' antitrust claims. [18]

**All Citations**

92 F.4th 381

## Footnotes

\*   The Clerk of Court is directed to amend the caption as set forth above.

1   More generally, this Court has observed that, given the "potentially enormous cost of fact discovery" in antitrust cases, "district courts retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." ⚑ In re Elevator Antitrust Litig., 502 F.3d 47, 50 n.4 (2d Cir. 2007) (per curiam) (citing ⚑ Twombly, 550 U.S. at 558, 127 S.Ct. 1955) (internal quotation marks omitted).

2   The inverse relationship between Treasury prices and yields is that when prices fall, yields rise, and vice versa.

3   These names are shorthand for particular corporate entities described in the Amended Complaint.

4   Suppose that the Treasury department was offering $10 billion of three-year notes at an auction. Bidder 1 bids for $1 billion of the notes at a 2% yield; bidder 2 bids for $5 billion at a 2.5% yield; bidders 3 and 4 each bid for $4 billion at a 3% yield; and bidders 5 and 6 each bid for $2 billion at a 4% yield. Bidders 1 and 2 would each receive the entire allocations they sought, $1 and $5 billion, respectively, for a total of $6 billion, leaving only $4 billion for the other bidders. Bidders 3 and 4, in turn, would receive only one-half of their desired

allocations: $2 billion out of $4 billion. Bidders 1 through 4, however, would all obtain the 3% yield submitted by bidders 3 and 4 (even though bidders 1 and 2 bid at lower yields (2% and 2.5%, respectively)); and this stop-out yield would set the auction price. Bidders 5 and 6, which submitted bids with a yield (4%) higher than the stop-out yield (3%), would receive nothing; their bids would not be accepted.

5    Relatedly, Goldman Sachs reportedly "won almost all auctions" for Treasury bonds. JA 814 (Am. Compl. ¶ 217 (internal quotation marks omitted)).

6    Bank of America, Barclays, BNP, Credit Suisse, Goldman Sachs, JP Morgan, Morgan Stanley, RBS and UBS--but not Citi.

7    This remains true even though Plaintiffs named as defendants "UBS AG, UBS Securities, *and their subsidiaries* and affiliates." JA 775 (Am. Compl. ¶ 105 (emphasis added)).

8    The Amended Complaint cites a sixth transcript excerpt in support of its plus factors for the auction allegations. This chat, however, is even more far afield: the two participants are former colleagues of Primary Dealer X-- not two (or even one) Auction Defendants.

9    Plaintiffs emphasize one of the chat excerpts in which traders from Primary Dealer X and Credit Suisse said they would set up a "persistent chat"; and Plaintiffs argue that, overall, the quoted transcripts "represent the proverbial tip of the iceberg." Plaintiffs' Br. 30. We will not speculate as to what these two traders--only one of whom works at an Auction Defendant--may have later discussed as part of an ongoing dialogue, or what other Treasury traders might have shared in other similar chats. In any event, information sharing is not, in itself, a per se violation of Section 1 of the Sherman Act. 🔖U.S. v. Citizens & S. Nat'l Bank, 422 U.S. 86, 113, 95 S.Ct. 2099, 45 L.Ed.2d 41 (1975). We reach the same result here under a rule-of-reason analysis. A trader from one defendant exchanging market chatter with one non-defendant on a regular basis does not constitute an antitrust violation. See 🔖U.S. v. U.S. Gypsum Co., 438 U.S. 422, 441 n.16, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978) ("nature of the information exchanged" is among the factors to be considered under rule of reason).

10    Consider again the auction success statistic, which Plaintiffs define as the amount of Treasuries the primary dealers obtained as a proportion of the amount they bid for. Suppose that the primary dealers bid for $10 billion in Treasuries and received $5 billion, for a success rate of 50%. The Auction Defendants themselves, as the allegedly dominant auction participants, bid for $6 billion but obtained only $2 billion. Yet the other primary dealers received $3 billion of the $4 billion they bid for. The Auction Defendants' success rate would be 33.3%, whereas the other primary dealers would have a success rate of 75%. Plaintiffs' data would not capture this distinction. Rather, it would tout the primary dealers' overall 50% success rate as evidence that the Auction Defendants conspired to rig Treasury auctions, even though they were far less successful than the other primary dealers.

11    The Boycott Defendants comprise the Auction Defendants minus BNP, RBS and UBS.

12    Of course, a complaint alleging an antitrust conspiracy can include references to the defendants as a group, and other claims of collective conduct. But the allegations nevertheless must separately identify how each particular defendant contributed to the alleged conspiracy. *E.g.*, 🔖Litovich, 568 F. Supp. 3d at 435 ("It is fundamental to pleading in the post-🔖Twombly era that before a defendant is forced to be held to account for conduct as serious as a conspiracy in restraint of trade in violation of the Sherman Act that the pleader inform the defendant what it is alleged to have done."); 🔖Interest Rate Swaps Litig., 2018 WL 2332069, at *17 (holding that allegations did not plausibly show a 🔖Section 1 violation when "[t]he Dealers' parallel actions, motivations, perspectives, and intentions are largely pled generically and in undifferentiated fashion,

with the [complaint] not specifying a particular defendant or defendants"); Mexican Gov't Bonds, 412 F. Supp. 3d at 389 (concluding that Plaintiffs "have not alleged anything that would plausibly suggest that the particular defendants named in this suit were part of [the] conspiracy" (internal quotation marks omitted)); see also Areeda & Hovenkamp ¶ 1409 (courts should endeavor to "identify *with maximum particularity* the alleged conspirators" (emphasis added)).

13     Tradeweb Markets separately operates a D2C trading platform called Tradeweb.

14     Plaintiffs also speculate that two other related developments were nefarious: (1) Tradeweb Markets purchased the platform previously known as eSpeed in 2021 and incorporated it into Dealerweb's D2D platform; and (2) Tradeweb Markets decided to operate Dealerweb as a D2D platform and Tradeweb as a D2C platform. In neither case, however, do Plaintiffs plausibly show that defendants were not merely acting pursuant to their "independent self-interest" in maintaining a market structure that was beneficial to each of them. 🚩🔺Ins. Brokerage, 618 F.3d at 326.

15     Plaintiffs assert that this conflict of interest was a pretext, given that Direct Match and State Street had previously discussed State Street's ownership of the other platform without issue. "[D]evoid of further factual enhancement," this "naked assertion[ ]" does not suffice, even at the pleading stage. 🚩Iqbal, 556 U.S. at 678, 129 S.Ct. 1937 (internal quotation marks omitted).

16     Similarly, Plaintiffs assert that the Boycott Defendants did not commit liquidity to Direct Match.

17     Plaintiffs largely fail to allege parallel conduct with respect to the alleged boycott conspiracy, precluding them from demonstrating an agreement based on indirect evidence regardless of their plus factors. Whether standing alone or considered together, however, none of the factors adduced by Plaintiffs, see JA 925–28 (Am. Compl. ¶¶ 496–505), would help their cause, see 🚩Twombly, 550 U.S. at 557, 127 S.Ct. 1955 (allegations of parallel conduct "must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action").

18     Plaintiffs' two claims for unjust enrichment are predicated on the alleged auction and boycott conspiracies, respectively. Because Plaintiffs fail to state a Sherman Act claim with respect to either alleged conspiracy against any defendant, their unjust enrichment claims fail too.

---

**End of Document**                                      © 2024 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**   © 2024 Thomson Reuters. No claim to original U.S. Government Works.     23